### In re PRYOR et al.

[Cite as *In re Pryor* (1993), 86 Ohio App.3d 327.]

Court of Appeals of Ohio,
Athens County.

No. 92 CA 1522.

Decided Feb. 12, 1993.

---

*Sowash, Carson & Shostak* and *Beth B. Ferrier,* for appellant Nyowka Taylor.

*Gwinn & Wallace* and *James A. Wallace*, for appellant Charles Taylor.

*Walker & Walker Co., L.P.A.*, and *William R. Walker*, for appellee Galen Keith Dennison.

*Eslocker, Hodson & Dioguardi* and *Thomas S. Hodson*, for appellees Michael P. Mercer and Roger Pedigo, guardians *ad litem*.

———————

STEPHENSON, Judge.

This is an appeal from a judgment entered by the Juvenile Division of the Court of Common Pleas of Athens County awarding custody of Paulina Pryor, born December 18, 1988, to her biological father, appellee Galen Keith Dennison, and awarding custody of Tasha Taylor, born December 1, 1989, and Nyowka Christine Taylor, born March 8, 1991, to their father, appellant Charles Taylor. The biological mother of all three children, Nyowka Taylor, assigns the following errors for our review:

"I. The trial court erred as a matter of law by failing to apply the relevant statutory factors outlined in Ohio Revised Code Section 3109.04 in determining that a change of custody was in the best interest of the minor child, Paulina Pryor.

II. The trial court erred as a matter of law by awarding legal custody of Tasha Taylor and Nyowka Christine Taylor to Charles Taylor, subject to an order of protective supervision.

III. The guardian ad litem failed to adequately protect the interests of the minor children.

IV. The trial court's findings of fact and conclusions of law are against the manifest weight of the evidence."

Appellant Charles Taylor assigns the following error with respect to the award of custody of his stepdaughter, Paulina, to her biological father:

"The trial court erred in failing to apply a 'best interest' test in determining whether custody of Paulina Pryor should be awarded to a non-parent; and instead applying a 'suitability' or 'detriment' test."

The record reveals the following facts pertinent to this appeal. On December 18, 1988, appellant Nyowka Pryor, n.k.a. Nyowka Taylor, gave birth to her daughter Paulina. At the time, Nyowka was an unwed mother and a senior in high school. A parentage action was brought and appellee, Galen Keith Dennison, with whom Nyowka had resided for several months prior to her pregnancy, was found to be Paulina's father. Dennison was, thereafter, ordered to pay monthly child support in the amount of $197.18.

On May 25, 1989, Nyowka and appellant, Charles Taylor, were married.[1] Nyowka Christine Taylor[2] and Tasha Taylor were later born as issue of such marriage. In June or July 1991, appellants began having marital problems. Nyowka left the marital residence in September of 1991 and moved in with her new boyfriend, Dale Treadway. The children were left behind with Charles Taylor.

On November 20, 1991, Athens County Children's Services ("ACCS") commenced the action below by filing three separate complaints, with identical allegations, to the effect that appellants' children were neglected and dependent, pursuant to R.C. 2151.03 and 2151.04. ACCS alleged that the children's home environment was "nearly a constant state of violence and threats of violence due to the behaviors of [appellants] and various extended family members and acquaintances." ACCS further explained that the events going on in the house were emotionally traumatic to the children and had encouraged them to become violent with each other. The children, nonetheless, were left in the custody of Charles Taylor.

Instead, ACCS filed a motion requesting (1) a predispositional order of protective supervision over the children's home and its environment, (2) a restraining order against a maternal uncle ordering him to have no contact with Charles Taylor in front of the children, and (3) a strict schedule during which Nyowka would be able to visit with the children as well as an order not to remove any furnishings from the marital residence. The matter came on for hearing on November 25, 1991, and judgment was subsequently entered granting the requested relief.

Dennison appeared in the action on December 11, 1991, and moved for custody of his daughter Paulina pursuant to R.C. 2151.353(A)(2). Although no further motions were filed of record below, both appellants indicated to the court that they each sought custody of all three children.[3]

---

1. We acknowledge inconsistencies in the record as to the date on which appellants were actually married. Inasmuch as the lower court's findings of fact determined it to be May 25, 1989, we do the same for purposes of consistency.

2. Hereinafter, we refer to the minor child Nyowka Christine Taylor as "Christine" in order to distinguish her from her mother, appellant Nyowka. We should also point out that the transcript indicates a degree of uncertainty as to whether Charles Taylor is actually Christine's biological father. Nevertheless, in that appellants were married at the time of her birth, we will assume such status for purpose of this appeal. See R.C. 3111.03(A)(1).

3. At some point during the course of this action below, appellants were also engaged in a separate divorce proceeding and, presumably, were each seeking custody in anticipation of their marriage being terminated. The current state of their marriage and impending divorce is unclear. It was revealed during the hearings below that Nyowka had terminated her

An adjudicatory hearing was held on December 16, 1991, at which time the parties stipulated that the children were dependent pursuant to R.C. 2151.04, and ACCS dismissed the remaining allegations of neglect from their complaints. After a subsequent dispositional hearing, the lower court ruled that Dennison would receive custody of his daughter, Paulina, and that custody of the two remaining children would be given to their father, Charles Taylor. A judgment to that effect was entered on February 7, 1992, and this appeal followed.

We first consider the assignment of error advanced by Charles Taylor wherein he argues that the lower court erred in failing to apply the standard of best interest of the child in determining whether custody of Paulina should have been awarded to him or to her natural father. However, it is not entirely clear to us that such a standard was not applied during the proceedings below. Findings of fact and conclusions of law issued by the court expressly state "[t]hat as between Galen Keith Dennison and Charles Taylor it has been proven by clear and convincing evidence that it would be [in the] *best interest* of Paulina * * * for legal custody to be awarded to * * * Dennison." (Emphasis added.) This implies that a best interest of the child standard was, in fact, employed by the court.

■ Nevertheless, Charles Taylor argues that the lower court failed to distinguish between the standard of best interest of the child and other various tests used to determine custody between a parent and a nonparent. We disagree. It is beyond question that the primary, if not only, consideration in the disposition of all children's cases is the best interests and welfare of the child. Kurtz & Giannelli, Ohio Juvenile Law (1989) 167, Section 13.01. However, considerations of parental rights and suitability and any detriment from a custody award must also be factored into the "best interest" equation. Given that this is a confusing and seemingly contradictory area of our jurisprudence, a brief review of the law is in order.

The rule in Ohio has long been that, in cases of controverted custody rights, "the *welfare* of the minor child is first to be considered." (Emphasis added.) *Clark v. Bayer* (1877), 32 Ohio St. 299, at paragraph one of the syllabus; see, also, *In re Tilton* (1954), 161 Ohio St. 571, 575, 53 O.O. 427, 428, 120 N.E.2d 445, 449; *Gishwiler v. Dodez* (1855), 4 Ohio St. 615, at paragraph two of the syllabus. This principle was extended by the Supreme Court in *Boyer v. Boyer* (1976), 46 Ohio St.2d 83, 86–87, 75 O.O.2d 156, 157–158, 346 N.E.2d 286, 288–289, to help justify

---

relationship with Dale Treadway, as well as a relationship with a certain Charles Alltoff, and had moved back into the marital residence, where Charles Taylor was living with his girlfriend, Pam Koon. Although Charles Taylor testified that he and Nyowka were attempting to reconcile their relationship, Nyowka stated that they were not then living as "man and wife."

the award of custody to grandparents over both of the natural parents. It was determined that a trial court could award custody of a child to a relative in those instances where it was found that custody to neither parent would be in the child's best interest. *Id.* at paragraph one of the syllabus. This could be done even though the parents were not found unfit or unsuitable. *Id.* The *Boyer* decision, however, is based on a construction of R.C. 3109.04 (custody disputes arising from divorce actions) and is arguably inapposite to a custody battle emanating from a neglect or dependency action commenced under R.C. Chapter 2151.[4]

Nevertheless, a slightly modified version of the standard was applied to such cases in *In re Perales* (1977), 52 Ohio St.2d 89, 96, 6 O.O.3d 293, 296, 369 N.E.2d 1047, 1051. The court affirmed that the welfare of the child must be given top priority. *Id.* at 98, 6 O.O.3d at 297, 369 N.E.2d at 1052. However, a distinction was drawn between custody disputes arising in divorce actions under R.C. 3109.04 and those arising under R.C. Chapter 2151. *Id.* at 96, 6 O.O.3d at 296, 369 N.E.2d at 1051. It was reasoned that, inasmuch as divorce-related custody disputes involved parents on an equal footing before the law and considering that both parents may be eminently qualified to raise the child, questions of parental suitability would be inappropriate and the child's best interest would be the only consideration.

However, the court continued, custody proceedings initiated under R.C. Chapter 2151 require a broader scope of inquiry, because they invoke the fundamental rights of parents to raise their own children. *Id.*[5] Child custody may not be awarded to a nonparent in these instances "without first making a finding of parental unsuitability—that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody

---

4. Custody proceedings incident to a divorce under R.C. 3109.04 are distinct and unrelated to neglect or dependency actions under R.C. Chapter 2151. See *Moore v. Moore* (Jan. 22, 1991), Gallia App. No. 89CA26, unreported, at 8, 1991 WL 13905; *Patton v. Patton* (1963), 1 Ohio App.2d 1, 3, 30 O.O.2d 49, 50, 203 N.E.2d 662, 663; *In re Small* (1960), 114 Ohio App. 248, 249, 19 O.O.2d 128, 128, 181 N.E.2d 503, 505. Nevertheless, the legal considerations are often the same and, therefore, the same standards are used to determine the best interests of the child under either statute. *Thrasher v. Thrasher* (1981), 3 Ohio App.3d 210, 213, 3 OBR 240, 242, 444 N.E.2d 431, 433.

5. The law has long held that parents who are suitable persons have a "paramount" right to custody of their children. See *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, 1171; *Clark v. Bayer* (1877), 32 Ohio St. 299, 310 *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606; *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558; *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652.

to the parent would be detrimental to the child." *Id.* at the syllabus. The court reconciled the issues of parental suitability and best interest of the child as follows:

"It is the last criteri[on], * * * unsuitability, which allows the court to balance the interests of parent and child and avoid operating under the premise criticized in *Boyer v. Boyer, supra,* [46 Ohio St.2d] at page 87 [75 O.O.2d 156, 158, 346 N.E.2d 286, 289], that 'the child's right to a suitable custodian and parental rights, when not in harmony, are *competing* interests, requiring that one give way to the other.' (Emphasis added.) If courts dealing with the general concept of suitability measure it in terms of the harmful effect of the custody on the child, rather than in terms of society's judgment of the parent, the welfare of the child should be given the priority which is called for in the *Clark* opinion." *Id.* at 98, 6 O.O.3d at 297, 369 N.E.2d at 1052.

Although somewhat cryptic, the *Perales* decision appeared to submerge the issues of parental rights and suitability into the broader "best interest" standard and then define suitability in terms of the best interests of the child. Thus, in *Thrasher v. Thrasher* (1981), 3 Ohio App.3d 210, 214, 3 OBR 240, 243, 444 N.E.2d 431, 434, the court held that the best interests of the child are deemed served, and the natural rights of the parent are protected, if the family structure is maintained as much as possible. However, if granting custody to a parent is detrimental to a child, then the court is still free to grant custody to a nonparent. *Id.* This court has previously adopted the interpretation given by the *Thrasher* decision. See *Adkins v. Adkins* (Feb. 13, 1985), Pike App. No. 370, unreported, 1985 WL 6537.[6]

In sum, the *Boyer, Perales* and *Thrasher* decisions all affirm that the best interest of the child remains the primary standard to be applied in custody cases. Nevertheless, while the welfare of the child is the primary consideration, suitable parents have a paramount right to custody. *Adkins, supra,* at 4. Before divesting a parent of this right and awarding custody to a nonparent, the court must determine whether a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the

---

**6.** The Sixth District Court of Appeals in the case of *In re Whiting* (1990), 70 Ohio App.3d 183, 186, 590 N.E.2d 859, 860, has erroneously concluded that there is a conflict of authority within this district as to the proper standard to apply in these cases. Cf. *Van Hoose v. Van Hoose* (Apr. 19, 1990), Pike App. No. 433, unreported, 1990 WL 54873, and *Manering v. Manering* (May 2, 1989), Jackson App. No. 559, unreported, 1989 WL 47871. A close review of the *Manering* case will reveal that it was only a plurality judgment and no majority decision can be said to have emanated therefrom. Thus, there is no conflict. The only approach which has consistently commanded a majority of this court is that taken in *Van Hoose, supra,* as well as *Adkins v. Adkins* (Feb. 13, 1985), Pike App. No. 370, unreported.

child or that an award of custody to the parent would be detrimental to the child. *Perales, supra,* at the syllabus; see, also, *Van Hoose v. Van Hoose* (Apr. 18, 1990), Pike App. No. 433, unreported, at 5–6, 1990 WL 54873; *Long v. Long* (Sep. 11, 1986), Washington App. No. 84 × 14, unreported, at 7–9, 1986 WL 11025. After a thorough review of the record in the cause *sub judice,* we are satisfied that this standard was properly applied below.

■ The trial court expressly found that Dennison was a suitable parent and that it was in Paulina's best interest for legal custody to be awarded to her father. There is no indication that Dennison abandoned the child, contractually relinquished her custody or had become totally incapable of caring for his daughter. The court also found that there was no detriment in this arrangement to Paulina. In short, the standard of best interest of the child was correctly applied and the error assigned for our review by Charles Taylor is, accordingly, overruled.

We now turn to Nyowka's first assignment of error, wherein she advances several arguments to the effect that the court erred in failing to apply certain statutory factors in determining whether custody of Paulina should have been awarded to her natural father. Nyowka first argues that ACCS did not participate in the hearings below and this indicates that the lower court conducted the proceedings more as a modification of custody case than a neglect or dependency action. Nyowka then reasons that the court erred in not applying the statutory factors set forth in R.C. 3109.04(F)(1) for determining modification of custody and allocation of parental rights. We disagree.

■ The juvenile court has express statutory authorization to award legal custody of a dependent child to a parent who files a motion requesting such custody. R.C. 2151.353(A)(3). This sort of disposition does not change the nature of a dependency action to a custody modification proceeding. Likewise, there is nothing in the statutory scheme of either R.C. Chapter 2151 or 3109 which automatically converts a dependency action into a custody modification proceeding upon the nonparticipation by a children's services agency in the dispositional hearing. Nyowka cites no authority in support of that position and we are not aware of any. Assuming *arguendo* that ACCS was required to participate in the dispositional hearings below, then one of the parties should have raised this issue before the trial court so that it could be dealt with at the appropriate time. Our review of the record reveals no objection to the decision that ACCS would not participate in the hearing and, therefore, any error was waived.

■ Nyowka also argues that the lower court erred in not considering those factors set forth in R.C. 3109.04(F)(1) for determining the best interest of a child

relative to an award of custody. Appellant's argument is based on the following requirement of R.C. 2151.23(F)(1):

"The juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 * * * of the Revised Code."

Nyowka reasons that this statute now requires a consideration of the R.C. 3109.04(F)(1) factors for determining a child's best interest every time there is a custodial disposition of a dependent child to a parent under R.C. 2151.353(A)(3). Again, we disagree.

A juvenile court may obtain jurisdiction over child custody cases certified to that court from either a domestic relations court, R.C. 3109.06 and 2151.23(D), or from a probate court, R.C. 2111.46 and R.C. 2151.23(E). R.C. 2151.23(F)(1), upon which Nyowka relies, is intended to restrict the dispositional alternatives in these certified cases to those outlined in the general custody statute of R.C. 3109.04 and prevent the juvenile court from using of the more diverse dispositional alternatives in R.C. 2151.353. See Kurtz & Giannelli, *supra*, at 89–90 and fn. 119, Section T 7.03(J). There is nothing to indicate that the General Assembly intended for the juvenile courts to use the indicia of the best interest of the child from R.C. 3109.04(F)(1) in making a custodial disposition of a dependent child pursuant to R.C. 2151.353(A)(3). Had that been the intended result, then surely a more explicit directive would have been enacted.[7]

There does not appear to be any definitive test or set of criteria to apply in determining the best interest of a child in parental custody proceedings incident to a dependency action. Thus, in our opinion, the juvenile courts should consider the totality of the circumstances, including, to the extent they are applicable, those factors set forth in R.C. 3109.04(F). There is, however, no statutory mandate that they be expressly considered and balanced together before fashioning an award of custody under R.C. 2151.353(A)(3). Nyowka cites nothing which supports her argument on this issue and we can find nothing in our own research. Consequently, her first assignment of error is overruled.

---

7. We also reject a similar argument by Charles Taylor to the effect that R.C. 2151.23(F) was enacted pursuant to "Senate Bill 89" and thus presumably supersedes the Supreme Court's holding in *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047. To begin, that portion of R.C. 2151.23(F) providing that the juvenile court shall exercise its jurisdiction pursuant to R.C. 3109.04 was enacted as part of H.B. No. 93, 140 Ohio Laws, Part I, 1839, 1840, rather than Am.Sub. S.B. No. 89, 142 Ohio Laws, Part I, 198, 205, which merely relocated this language from subsection (F) to subsection (F)(1). The stated purpose of the legislation which added this language to the statute was "[t]o amend sections 2151.23 * * * of the Revised Code to assure that child custody dispositions made *on the death of a custodian* conform with the basic custody provision governing the best interests of children * * *." (Emphasis added.) 140 Ohio Laws, Part I, at 1839. There is no indication that the General Assembly intended this legislation to extend to, and alter, custodial priorities between parent and nonparent.

The second assignment of error is directed at the lower court's disposition of Christine and Tasha Taylor. As stated previously, the custody of these two children was awarded to their natural father, Charles Taylor, subject to an order of protective supervision. Nyowka makes no argument that she was wrongfully deprived of custody of her two daughters. Rather, she argues that the court was without authority to make such an order and cites the following dispositional alternatives provided for in R.C. 2151.353(A):

"(1) Place the child in protective supervision;

"(2) Commit the child to the temporary custody of a public children services agency, a private child placing agency, either parent, a relative residing within or outside the state * * *;

"(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child;

"(4) Commit the child to the permanent custody of a public children services agency or private child placing agency * * *;

"(5) Place the child in long-term foster care * * *[.]"

Nyowka contends that the lower court could award custody of the two girls to their natural father or issue a protective supervision order. However, Nyowka concludes, the court could not take both alternatives. We disagree. The statute expressly provides that "[i]f a child is adjudicated * * * [a] dependent child, the court may make *any* of the * * * orders of disposition" specified therein. (Emphasis added.) R.C. 2151.353(A). The statute does not expressly limit a court to only one dispositional alternative and the word "any" usually refers to one, or more, of a specific number or quantity. See Webster's Ninth New Collegiate Dictionary (1983) 93. Although, as a practical matter, most instances will involve the use of only one of these alternatives, we discern no rule of law which would affirmatively restrict the court's options.

Our conclusion is further buttressed by the fact that we are required to liberally interpret and construe R.C. Chapter 2151 in order to provide for the care and protection of children and to ensure that they are separated from their parents only when necessary for their welfare. R.C. 2151.01(A) and (C). A liberal construction of R.C. Chapter 2151 has, on occasion, even allowed for a particular child custody disposition which is not sanctioned by statute so long as it is in the best interest of the child. See *In re Lyczkowski II* (Dec. 21, 1987), Butler App. No. CA87–04–058, unreported, 1987 WL 30337. In the cause *sub judice,* an award of custody to a parent and a protective supervision order are both expressly sanctioned by statute. A liberal construction of the dispositional alternatives set forth in R.C. 2151.353(A) should allow for both of them to be used

where it is in the child's best interest and their use will help assist a family to remain united. As discussed below in this opinion, the record is replete with indications of violence and chaos in the Taylor home. By awarding custody of Christine and Tasha to their father, under a protective supervision order, the lower court has allowed for the children to stay in their home yet remain under the watchful eye of ACCS. There is nothing erroneous in this disposition.

Moreover, it would appear to us that any error in entering a protective supervision order was waived. During cross-examination, Nyowka opined that her husband was the only one of the two of them who had sufficient income and a home to care for the children. She also testified that he had done a "very good job" with them during the time they were in his custody. This would suggest that Nyowka favored Charles Taylor being awarded custody of the three girls. With this in mind, we note the following colloquy between Nyowka and her counsel:

"Q. Would you be willing to work with Children Services under some kind of a *protective supervision order* in order to be· reunited with your children?

"A. Yes." (Emphasis added.)

█ Nyowka consented at the hearing to a protective supervision order. In that the thrust of her argument on appeal is directed at the entry of that order, rather than the award of custody to her husband, any error in such a disposition would have been waived. For these reasons, the second assignment of error is overruled.

In her third assignment of error, Nyowka contends that the judgment should be reversed because the guardian *ad litem* failed to give "effective representation" or to "adequately protect" the interests of the minor children. There are a number of conceptual problems with these contentions that ultimately lead us to the conclusion that they are without merit.

█ To begin, appellant cites no authority and it is not immediately apparent to us that a custodial disposition of dependent children should even be reversed merely on the basis of arguably ineffective service by the guardian *ad litem.* Assuming *arguendo* that a reversal would be proper under such circumstances, it is unclear whether Nyowka would have standing to object to any such ineffective service. The duty of a guardian *ad litem* is to protect the interests of the child. *In re Height* (1975), 47 Ohio App.2d 203, 206, 1 O.O.3d 279, 281, 353 N.E.2d 887, 890. The guardian has no duty whatsoever to protect parental interests in retaining child custody. In that Nyowka has standing in this case to raise only those issues which affect her own legal interests, see *In re Johnson* (July 31, 1991), Lorain App. No. 90CA4944, 90CA4945, 90CA4946 unreported, 1991 WL 123047; see, also, *In re Guardianship of Love* (1969), 19 Ohio St.2d 111,

113, 48 O.O.2d 107, 108, 249 N.E.2d 794, 795. It is questionable whether she would be the proper party to raise alleged errors which affect only the legal interests of the dependent children.

 These problems aside, we are not persuaded that the actions taken by the guardian *ad litem* in this case were inadequate. Nyowka asserts that the guardian ineffectively represented the children, misunderstood the dispositional alternatives before the court and was confused about the law to be applied to the proceeding. Although we disagree with most of these charges, it should be pointed out that, in any event, the duty of a guardian to his ward is not the same as that of a lawyer to her client. *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 232, 17 OBR 469, 470, 479 N.E.2d 257, 260. The role of a guardian *ad litem* is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. *Id.* This does not necessarily require an exact knowledge of the applicable law or an ability to submit the guardian's recommendation with great legal precision. Our review of the guardian *ad litem's* report and recommendation in this case reveals that it was based, at least in part, on an investigation and inspection of the Taylor home as well as interviews with both Charles and Nyowka Taylor. While it may be that some of the statements in that report are based on hearsay from other sources, we do not find that to be a fatal flaw in the report.[8] For these reasons, we find no merit to the third assignment of error and the same is overruled.

 The final assignment of error presents a shotgun argument to the effect that numerous factual findings and conclusions of law are against the manifest weight of the evidence, that the lower court's judgment is against the manifest weight of the evidence, and that its disposition of the children was an abuse of discretion. The standard of review for all of these is the same. In that the lower court served as trier of fact, we will not disturb its individual findings of fact where they are supported by sufficient evidence, Whiteside, Ohio Appellate Practice (1991) 71, Section 7.02(6), and its judgment will not be reversed where supported by some competent credible evidence going to all essential elements of the case, *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578 at the syllabus. Likewise, a juvenile court's "best interest" analysis and decision during the dispositional phase of the proceedings will not be overturned where the decision is supported by competent credible evidence. *Johnson, supra; In re Seabeck* (Apr. 17, 1991), Summit App. No. 14882, unreported, 1991 WL 60693. The ultimate issue to be resolved under this assignment of

---

**8.** Hearsay evidence is expressly admissible in the dispositional phase of a dependency action. Juv.R. 34(B)(2); R.C. 2151.35(B)(2)(b).

error is whether there was sufficient evidence adduced below to support a finding that it was in the childrens' best interests for legal custody to be awarded to their respective fathers. Although several of the lower court's minor factual findings may be lacking in evidentiary support, our review of the record uncovers a sufficient basis for the final judgment.

The evidence is uncontroverted that Nyowka's brother, Anthony Pryor, has precipitated a number of violent episodes at the Taylor home. One incident, in September 1991, resulted in physical damage to the premises. Although a restraining order was issued against Nyowka's brother in November 1991, he returned to the premises in violation of the order and ultimately attacked his mother, Beulah Pryor, with a metal car-bumper jack. Criminal charges were pending against Mr. Pryor at the time of the hearing below as a result of this incident. Tina Blair, another sibling, testified that Nyowka had various other altercations with their brother and, on occasion, had been struck by him in front of the children. This, however, was not the only evidence of violence in the Taylor home.

There was also testimony by Blair that Nyowka and her mother had been in a "big fight" in October 1991, in front of the children. Laura Bobo, caseworker for ACCS, recounted an incident from November of that year when Nyowka and her mother fought so severely that sheriff's deputies were contacted. Bobo further related an incident in which Nyowka confided that her father had struck her in the head. There was also testimony to the effect that Nyowka had previously threatened the safety of Charles Taylor and their children.

The court below found that all this physical violence had detrimentally affected the three children. Nyowka argues that this conclusion is not supported by the record. This argument is without merit and we summarily reject it. Common sense dictates that a violent home atmosphere provides less than a suitable environment in which to raise a child. Blair also testified that the children, in particular Paulina, were upset by these "fights." This observation was corroborated by Charles Taylor who testified that the fights would scare Paulina who would "cry or whimper." In short, we find no error in the court's conclusion that this violence had a detrimental impact on the children.

There is other evidence in the record which further indicates a chaotic, if not unstable, environment in the Taylor home.[9] Testimony by Bobo reveals that,

---

9. Nyowka objects in her brief to the lower court's considering matters other than the original violence allegations in the complaint(s) when rendering its dispositional order. We discern no error. The dispositional phase of a dependency action involves a much broader inquiry into the child's environment than the adjudicatory phase. 2 Anderson, Ohio Family Law (1989) 305, Section 20.1. That is because the best interest of the child is to be considered. *In re*

on occasion, there have been as many as nine family members and others residing in the Taylor home, including the then current paramours of Nyowka and Charles Taylor. Periodically, the family has run out of money by the end of the month and has relied on others to buy them food and baby formula and have pawned their VCR to buy diapers. There is also evidence to the effect that Nyowka has previously overdosed on valium. Although Nyowka testified that she has never refused to participate in any services offered by ACCS, the uncontroverted evidence adduced below is that said agency was never able to get her and Charles Taylor to attend parenting classes.

 The record presents a more favorable impression of Paulina's natural father. Dennison is an enlisted man in the United States Army and is currently stationed in Karlshrue, Germany, where he resides with his wife and daughter, Ashly. Although Ms. Dennison has previously worked with young children as a teacher's aide at the Nova Learning Center, she would be staying at home to care for the children. Dr. David Lowenstein, clinical psychologist, examined all three potential parents and conceded that Dennison's evaluation "looked much better" than those of Nyowka and Charles Taylor. Although Dr. Lowenstein testified to the effect that it would be traumatic to split up the sisters and that it would be "most beneficial" for Charles Taylor to retain custody, he also opined that it would be equally traumatic for Paulina to remain at home in a continuing atmosphere of violence. Given the evidence cited previously, we discern no error in the lower court's determination that an award of custody to Dennison would be in Paulina's best interest.

Nyowka argues that Dennison "abandoned" Paulina and that Charles Taylor "could have adopted the child." This argument distorts the record. While it is not entirely clear when support payments commenced, the uncontroverted evidence is that Dennison currently pays $197.18 a month and that he was first contacted about his obligations in September of 1989. Although Dennison has had little in the way of structured visitation with his daughter over the years, there was evidence introduced below that he had previously been threatened, harassed and even assaulted by various members of Nyowka's family. Nevertheless, Dennison maintains that he kept track of Nyowka and Paulina, even after he entered the service, through his own mother. This evidence, if found credible, would be sufficient to show that appellant had not abandoned his daughter but was merely attempting to avoid a confrontation with the belligerent Pryor family.

---

*Foust* (1989), 57 Ohio App.3d 149, 153, 567 N.E.2d 1042, 1046. Thus, any evidence which is in any way material and relevant to the "best interest" issue is to be admitted during dispositional proceedings. See Juv.R. 34(B)(2); see, also, *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 233, 17 OBR 469, 471, 479 N.E.2d 257, 260.

To be sure, Nyowka offered evidence to contradict Dennison's testimony. However, the lower court served as trier of fact and is better able than this court to observe a witness and assign the proper weight to his testimony. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. The trier of fact is free to rely on all, part or none of the testimony of that witness. *State v. Harriston* (1989), 63 Ohio App.3d 58, 63, 577 N.E.2d 1144, 1147; *Barber v. Barber* (July 10, 1992), Ross App. No. 1804, unreported at 9, 1992 WL 188492. This court will not second-guess a lower court's assessment of weight with respect to particular portions of testimony. *In re Bowers* (Jan. 2, 1992), Athens App. No. 1490, unreported at 10, 1992 WL 2870; *In re Pinkerman* (June 12, 1991), Scioto App. No. 90CA1938, unreported, at 9–10, 1991 WL 110011. The lower court evidently found Dennison's testimony in this case to be more credible than that given by Nyowka.

Finally, Nyowka argues that the trial court has taken inconsistent positions by finding it in the best interest of Tasha and Christine to place them in the Taylor home, but not Paulina. We find no inconsistency in the dissimilar disposition of the children. A child's custodial placement should remain with at least one natural parent unless there is some compelling reason to temporarily or permanently sever that relationship. The conditions in the Taylor home had, apparently, not yet reached a level where ACCS thought it necessary to obtain custody of the children. Nevertheless, an extra option was open with respect to Paulina that was not available for Tasha and Christine. A custodial placement with her natural father would assure Paulina of (1) remaining in the custody of a natural parent, and (2) an opportunity to escape a potentially hostile and unstable environment. In short, the dissimilar treatment between the three girls evidences not a lack of consistency but a lack of alternatives. For all these reasons, the fourth assignment of error is overruled.

Having reviewed all errors assigned and argued before us, and finding the same without merit, we affirm the judgment of the lower court.

*Judgment Affirmed.*

HARSHA and PETER B. ABELE, JJ., concur.

HARSHA, Judge concurring.

I concur in judgment and opinion. However, consistent with my dissenting opinion in *Van Hoose, supra,* I do not believe that in *all* custody proceedings between a parent and a nonparent there is a mandatory requirement to establish unsuitability before an award may be made to a nonparent. To the extent the principal opinion implies otherwise, I disagree.