OPINION
{¶ 1} In this consolidated appeal, appellant, Nasveta Memic (Mrs. Memic) appeals from the February 21, 2006 judgment entry of the Lake County Court of Common Pleas, Juvenile Division, granting temporary residential placement and legal custody of the minor children, Elmedina Memic (d.o.b. 8/21/97), Emena Memic (d.o.b. 8/30/98), and Jasmin Memic (d.o.b. 9/23/04) to their father, Elis Memic (Mr. Memic). We affirm the judgment of the trial court.
 {¶ 2} On June 21, 2004, the Lake County Department of Job and Family Services ("LCDJFS") filed a complaint to have Elmedina and Emena adjudicated as dependent children. The complaint was based upon an incident which occurred on April 10, 2004, when Wickliffe Police responded to a domestic disturbance call at the Memic residence. When police arrived, they discovered a distraught Mrs. Memic wielding a knife. Mr. Memic, who reported the incident, had barricaded himself and the children in another room until police arrived. The police spent over two hours at the Memic home before they successfully convinced Mrs. Memic to release the knife.
 {¶ 3} As a result of the incident, Mrs. Memic was removed from the home and charged with Domestic Violence and Resisting Arrest. Mrs. Memic later pled no contest to the Resisting Arrest charge, and the Domestic Violence charge against her was dismissed. Attorney Douglas Simek was appointed as guardian ad litem for the children on June 22, 2004.
 {¶ 4} On August 31, 2004, Mr. Memic filed a motion for temporary residential placement and legal custody of Elmedina and Emena. Mrs. Memic later followed with her own motion for temporary residential placement and legal custody.
 {¶ 5} On September 3, 2004, a hearing was held in which Mr. and Mrs. Memic voluntarily waived their right to an adjudicatory hearing. The children were subsequently placed under a protective supervision order and a case plan was developed. Pursuant to the voluntary agreement of the parties, Mr. Memic was granted temporary custody of the girls, with Mrs. Memic being granted supervised visitation rights. Mr. Memic remained in the marital home while Mrs. Memic resided at Forbes House, a women's shelter.
 {¶ 6} On September 3, 2005, Mrs. Memic gave birth to a son, Jasmin. On October 18, 2004, LCDJFS filed a complaint to have Jasmin adjudicated a dependent child. On October 29, 2004, the parties appeared before the magistrate and voluntarily consented to a finding of dependency with respect to Jasmin, and a protective supervision order was granted.
 {¶ 7} Jasmin resided with his mother at Forbes House under the protective supervision order until December 7, 2004, when the trial court granted an emergency ex parte order following a hearing. The order was based, in part, on concern that Mrs. Memic was contemplating a return to Germany. Mr. and Mrs. Memic, both natives of Bosnia, emigrated to the United States from Germany in April 2000.
 {¶ 8} Three days of hearings were held on the parties' respective motions for custody, concluding on May 12, 2005.
 {¶ 9} On June 14, 2005, the magistrate issued his decision, concluding that it would be in the children's best interest to grant legal custody to Mr. Memic.
 {¶ 10} After the trial court granted her leave to file, Mrs. Memic filed her objections to the magistrate's decision on October 27, 2005.
 {¶ 11} Mr. Memic and LCDJFS subequently filed responses to Mrs. Memic's objections, and the trial court conducted a hearing on the objections on February 6, 2006. Mrs. Memic waived her right to be present at this hearing.
 {¶ 12} On February 21, 2006, the trial court entered its judgment, overruling Mrs. Memic's objections and adopting the magistrate's decision in full.
 {¶ 13} Mrs. Memic timely appeals, assigning the following as error:
 {¶ 14} "[1.] The trial court erred to the prejudice of appellant by finding that the state had proven it was in the best interest of the children to grant full, legal custody to the father, Ellis [sic] Memic.
 {¶ 15} "[2.] The trial court erred to the prejudice of appellant by finding that the state had proven it was in the best interest of the children to grant full, legal custody to the father, Ellis [sic] Memic, as such finding was not supported by a sufficiency of the evidence [sic].
 {¶ 16} "[3.] The trial court erred to the prejudice of the appellant by not removing the Magistrate from hearing the within matter as circumstances may have caused the Magistrate to be a witness in a potential criminal case.
 {¶ 17} "[4.] The trial court erred to the prejudice of the appellant in admitting into evidence facts which occurred outside the record violating her due process rights and a fair trial.
 {¶ 18} "[5] The trial court erred to the prejudice of appellant in allowing testimony which was not relevant and/or was highly prejudicial."
 {¶ 19} For purposes of our analysis, we will consolidate certain assignments of error and address others out of the order in which they are presented.
 {¶ 20} Since Mrs. Memic's first and second assignments of error raise identical arguments, they will be addressed together. In her first and second assignments of error, Mrs. Memic argues that the trial court's finding that it was in the best interest of the children that legal custody be granted to Mr. Memic was based upon insufficient evidence and against the manifest weight of the evidence. We disagree.
 {¶ 21} When reviewing a trial court's decision on a manifest weight of the evidence basis, an appellate court is guided by the presumption that the findings of the trial court were correct. Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80; In re Williams, 10th Dist. Nos. 01AP-867 and 01AP-868, 2002-Ohio-2902, at ¶ 7. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures, and may use these observations in assessing the credibility of the testimony. Seasons Coal, 10 Ohio St.3d at 80. Thus, judgments which are supported by some competent, credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d. 279, at syllabus.
 {¶ 22} The test for sufficiency in this context is essentially the same, i.e., whether the trial court's judgment could be reasonably reached from the evidence presented. Brooks-Lee v. Lee, 10th Dist. No. 03-AP-1149, 2005-Ohio-2288, at ¶ 60, citing Hartford Cas. Ins. Co. v.Easley (1993), 90 Ohio App.3d 525, 530.
 {¶ 23} R.C. 2151.353 governs dispositional matters once a child has been found to be a dependent child. The statute provides, in relevant part, that "the court may * * * [a]ward legal custody of the child to either parent * * * who, prior to the dispositional hearing, files a motion requesting legal custody of the child. R.C. 2151.353(A)(3).
 {¶ 24} In the instant matter, both parties knowingly and voluntarily waived their right to an adjudicatory hearing, and the trial court found all three children were dependent as defined in R.C. 2151.04. Subsequently, both parents filed motions for legal custody of the children. A trial court has the authority "to award legal custody of an adjudicated dependent child to either parent in the disposition phase of the dependency proceedings." In re Cloud (May 19, 1997), 12th Dist. No CA96-01-002, 1997 Ohio App. LEXIS 2120, at *5. "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact." In re Fulton, 12th Dist. No CA2002-09-236, 2003-Ohio-5984, at ¶ 7, citing R.C.2151.011(B)(19). Thus, legal custody is not as drastic a remedy as permanent custody because a parent retains residual rights and has the opportunity to request the return of the children. In re A.W. — G., 12th Dist. No. CA2003-04-099, 2004-Ohio-2298, at ¶ 7, citing In re Nice,141 Ohio App.3d 445, 455, 2001-Ohio-3214.
 {¶ 25} On appeal, an appellate court will only review a legal custody determination for an abuse of discretion. Id at ¶ 6; Nice,141 Ohio App.3d at 455; In re Gales, 10th Dist. Nos. 03AP-445, 03AP-446,2003-Ohio-6309, at ¶ 12; In re D.P., 10th Dist. Nos. 05AP-117, 05AP-118, 2005-Ohio-5097, at ¶ 52. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 26} In matters involving child custody, the welfare of the child remains the paramount consideration. In re Pryor (1993),86 Ohio App.3d 327, 332 (citation omitted). When a court makes a custody determination under R.C. 2151.353, it must do so in accordance with the best interest of the child standard as set forth in R.C. 3109.04. Cloud, 1997 Ohio App. LEXIS 2120, at *4-*5; In re Poling, 64 Ohio St.3d 211,1992-Ohio-144, at paragraph two of the syllabus. Under this standard, there is no definitive test or set of criteria for the court to apply, rather, a court "should consider the totality of the circumstances, including, to the extent they are applicable, the best interest factors set forth in R.C. 3109.04(F)." Pryor, 86 Ohio App.3d at 336; In reMitchell, 11th Dist. Nos. 2002-L-078, 2002-L-079, 2003-Ohio-4102, at ¶ 14.
 {¶ 27} In determining the best interest of the child, R.C.3109.04(F)(1) lists the following relevant factors a court shall consider, including, but not limited to:
 {¶ 28} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 29} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 30} "(e) The mental and physical health of all persons involved inthe situation." (Emphasis added).
 {¶ 31} R.C. 2151.353 does not require a court to expressly consider or balance these factors in order for a custody award to be considered valid. Pryor, 86 Ohio App.3d at 336. However, a review of the record reveals that the trial court placed a heavy emphasis on the mental health of Mrs. Memic and the children, the children's interaction with their parents, each other, and other relatives, and the children's adjustment to their home, school, and community.
 {¶ 32} The magistrate's decision, which was adopted in full by the trial court, expressed a great deal of concern with regard to Mrs. Memic's mental health, finding her "emotionally disturbed" and in need of psychiatric treatment, based upon "erratic behavior [which was] well-documented and very troubling."
 {¶ 33} A review of the record reveals substantial evidence to support the magistrate's finding. At the hearing, the following testimony was adduced with respect to Mrs. Memic's behavior:
 {¶ 34} Mr. Memic testified to an incident which occurred in March 2002, when the couple lived in Fargo, North Dakota, in which Mrs. Memic threw a vase at Mr. Memic, spat upon him, and brandished a knife. Mr. Memic testified that the girls witnessed this episode, and were upset by their mother's actions. Following this incident, Mrs. Memic was treated for depression and prescribed medication, which she discontinued taking after her condition improved.
 {¶ 35} Mr. Memic testified to an incident which occurred in January 2004, in which a verbal argument escalated, with Mrs. Memic allegedly smashing and cutting a picture, throwing a vase on the floor, and brandishing or throwing a knife. Officer Donald Johnson of the Wickliffe Police, who investigated the incident, observed the broken picture and the broken vase, and found Mrs. Memic inside her bedroom, behind a closed door. When asked about the knife, Mrs. Memic indicated that she had it hidden underneath the bedspread and that she kept it there for her own safety when she was home alone. Officer Johnson testified that he observed no signs of physical abuse on Mr. or Mrs. Memic at the time of his investigation. Officer Johnson testified that he suggested counseling to Mrs. Memic at that time, based upon his conversation with Mr. Memic and his observations at the scene.
 {¶ 36} Elis Memic testified to another incident which occurred on April 4, 2004, in which Wickliffe Police were dispatched to the Memic residence after Mrs. Memic had become upset because he was going to take the girls and visit family nearby. Mr. Memic testified that Mrs. Memic took the keys to the car and refused to relinquish them.
 {¶ 37} There was also extensive testimony from Mr. Memic, and various Wickliffe police officers with regard to the incident which occurred on April 10, 2004, which led to the instant complaint against the Memics from LCDJFS. Mr. Memic testified that Mrs. Memic became upset and started yelling at him and the girls, spat on both of the girls and struck Emena. In addition, Mr. Memic testified that Mrs. Memic broke a lamp, threatened to destroy the computer, and threw a knife at him. As a result, Mr. Memic barricaded himself in the bedroom with the girls and called the police.
 {¶ 38} Officer Manus McCaffery and Sergeant Joseph Thompson of the Wickliffe Police Department testified that when they arrived at the Memic home that night, Mrs. Memic was wielding a large kitchen knife and refused to put it down, even though she was ordered at gunpoint to do so. After police were able to remove Mr. Memic and the girls from the apartment, Mrs. Memic told the officers that she wanted to kill her husband and asked Officer McCaffery if she could use his gun to shoot Mr. Memic. Sergeant Thompson testified that members of the Wickliffe Police SWAT team were summoned, and non-deadly force options were considered, since Mrs. Memic repeatedly refused to relinquish the knife despite numerous demands from the officers. Sergeant Pat Hengst was summoned to the scene as part of this effort. Eventually, officers were able to end the standoff through the use of non-deadly force after Mrs. Memic's attention momentarily lapsed. The resulting standoff lasted over two-and-a-half hours.
 {¶ 39} After being moved to a rescue squad unit for treatment for exposure to pepper spray, Mrs. Memic spat in Sergeant Hengst's face, and had to be subdued a second time. An oxygen mask was placed over Mrs. Memic's face during transport to the jail so that she could not spit at police again. Sergeant Hengst testified that after Mrs. Memic was transferred to the police station for booking, she was placed in a holding cell. At some point, Mrs. Memic requested to use the restroom. Sergeant Hengst went back to the holding cell with an oxygen mask and asked Mrs. Memic to put it on, at which time Mrs. Memic threw the mask on the ground, pulled her pants down and urinated in the drain of the holding cell.
 {¶ 40} In his decision, the magistrate also noted the testimony of Jamie Werner of LCDJFS, a social worker assigned to the case. On December 7, 2004, Werner assisted police officers in executing an ex parte order granting temporary custody to Mr. Memic, which was granted based upon concerns related by Mr. Simek, the guardian ad litem that Mrs. Memic might try to leave the country and take Jasmin with her. After arriving at Forbes House to pick up Jasmin, Mrs. Memic attacked Ms. Werner from behind, spitting on her and grabbing her hair to pull her to the ground before hitting and kicking her.
 {¶ 41} In addition to the aforementioned testimony, a review of the record reveals several instances of Mrs. Memic's strange behavior during the course of the trial. Several times, she interrupted witnesses as they attempted to testify. At various times, Mrs. Memic called the police officers "liars" and made comments during their testimony. She argued with the magistrate, at one point telling him he "need[ed] to see a doctor and take Paxil, because [he was] angry and [she was] not." Several times during the trial, Mrs. Memic refused to follow the magistrate's orders to be quiet during testimony, despite the threat of contempt charges.
 {¶ 42} Based upon our review, there is substantial competent, credible evidence which would justify the magistrate's findings that Mrs. Memic was emotionally disturbed and should seek psychiatric treatment "before she can properly care for her children."
 {¶ 43} The magistrate also considered the physical and mental well-being of the children themselves in making his decision. With regard to this issue, the magistrate stated: "Elemedina and Emena are confused by Nasveta Memic's actions. The children have been undergoing counseling with Heide [sic] Sliter of Crossroads. The girls told Ms. Sliter that their mother did not like them; they had come to this conclusion based upon Nasveta Memic's actions toward them — spitting on them, breaking their toys, yelling at them, hitting them and the like. Even though the children had been in counseling for some time, they had difficulty talking about past events. The interrelationship of the children with Mrs. Memic is poor."
 {¶ 44} A review of the record reveals competent and credible evidence to support the trial court's findings. There is also evidence that additional counseling was needed for the children, primarily Elmedina, and that Mr. Memic had been taking them to counseling for these issues.
 {¶ 45} While it is true that Sliter's testimony also revealed that the girls are happy to see their mother when they visit, and that it is a "good thing" that the girls have an opportunity to see their mother, this does not, by itself, lead to the conclusion that the trial court erred in granting custody to Mr. Memic when considering the totality of the circumstances.
 {¶ 46} Mrs. Memic cites to the testimony of Kate Proehl, a certified clinical nurse specialist at Pathways, a mental health center, who conducted an initial psychiatric evaluation on her at the behest of Forbes House on June 24, 2004, as proof that the magistrate's decision was against the manifest weight of the evidence.
 {¶ 47} Proehl diagnosed Mrs. Memic with adjustment disorder with depressed or anxious mood. According to her testimony, Proehl characterized Mrs. Memic's condition as "borderline," in that she was "struggling" with some anger issues. Proehl testified that she did not consider Mrs. Memic's condition cause for alarm, since Mrs. Memic told her that she had been physically and sexually abused by Mr. Memic, and because Mrs. Memic had lost her children and home, had no support system to speak of, and was pregnant and living in Forbes House by herself. The record established that Proehl has the appropriate certifications and authority to prescribe and dispense certain psychiatric medications, but declined to do so in Mrs. Memic's case, in part because she was pregnant.
 {¶ 48} However, a review of Proehl's testimony reveals that the aforementioned diagnosis was based upon a single 55 minute interview and based entirely on Mrs. Memic's self-reporting. Cross-examination revealed that while Proehl was generally aware of the incident which caused Mrs. Memic to arrive at Forbes House, she was unaware that Mrs. Memic held police at bay for over two and a half hours, that she refused to surrender the knife after repeatedly being told by police to do so, or that the two older children were present during the incident. Proehl testified that had she known these facts in greater detail or known that Mrs. Memic had previously been under psychiatric care for "severe depression," it would have had a bearing on her initial diagnosis.
 {¶ 49} The magistrate's decision also relied heavily on the recommendations of the Guardian ad litem report, which stated as follows:
 {¶ 50} "Elmedina and Emena have independently expressed their desire to continue to live with Elis. They like living with their dad and state that he takes good care of them. They like their room, and playing outside with friends. They are doing well in school, and have adjusted to having their brother at home. Since April 10, 2004, Elmedina and Emena have been in the custody of Elis, and on December 7, 2004, their brother Jasmin joined them. Elis has done a good job of taking care of the three children. He has taken the girls to school and daycare, and has taken Jasmin to all necessary medical appointments. He had abided by the court's instructions to receive an alcohol assessment and has honored all of his appointments with me and the Counselors at Crossroads. He has done everything in his power to ensure that he receives legal custody of Elmedina, Emena, and Jasmin. There is no reason to uproot the children from their current living arrangement."
 {¶ 51} These findings are consistent with the testimony of the guardian ad litem and other witnesses at trial.
 {¶ 52} Under the totality of the circumstances, there is substantial competent, credible evidence upon which the trial court could reasonably conclude that it is the children's best interest that Mr. Memic be granted legal custody. Accordingly, the trial court's judgment was not against the manifest weight of the evidence.
 {¶ 53} Mrs. Memic's first and second assignments of error are without merit.
 {¶ 54} Since Mrs. Memic's fourth and fifth assignments are concerned with the trial court's admission of disputed evidence, we will discuss them together.
 {¶ 55} In her fourth and fifth assignments of error, Mrs. Memic argues that the trial court erred in admitting testimony from Jamie Werner concerning events which occurred during a recess in the proceedings.
 {¶ 56} The incident in question occurred on February 14, 2005, and involved one of Mrs. Memic's outbursts during the trial when Sergent Hengst was on the stand. After Mrs. Memic began to get agitated, she was warned by the magistrate repeatedly that she would be held in contempt if she continued to interrupt the testimony. Despite these warnings, Mrs. Memic became increasingly belligerent and the magistrate declared a short recess and left the bench.
 {¶ 57} Werner testified that subsequent to the magistrate leaving the bench, Mrs. Memic remained vocal toward Sergeant Hengst and then turned around towards Werner and twice threatened to kill her. Werner testified that sheriff's deputies were summoned to the courtroom to quell the disturbance and during that time, Mrs. Memic spit on Mr. Memic's attorney. Werner testified that as the result of this incident, Mrs. Memic was charged with aggravated menacing and subsequently found guilty. It was further established that Ms. Werner's knowledge of the incident and the result of the trial was based upon her direct involvement with both.
 {¶ 58} Mrs. Memic's attorney objected to this testimony solely on the basis of relevance.
 {¶ 59} "Relevant evidence is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" State v. DeRose, 11th Dist. No. 2000-L-076, 2002-Ohio-4357, at ¶ 15, quoting Evid.R. 401. Generally, "relevant evidence is admissible, unless some other provision of law makes it inadmissible." Id. citing Evid.R. 402.
 {¶ 60} This evidence was highly relevant for the purpose of demonstrating Mrs. Memic's mental condition. At a minimum, it demonstrates Mrs. Memic's inability to manage her anger. In the instant matter, Mrs. Memic's mental condition was, without doubt, a fact of consequence to the determination of the action. Under the circumstances presented herein, the trial court did not abuse its discretion in admitting this testimony. Even had the admission of this evidence been improper, it would not have prejudiced Mrs. Memic given the overwhelming evidence on the record regarding her mental state.
 {¶ 61} Also in her fifth assignment of error, Mrs. Memic argues that the trial court erred to her prejudice by admitting Kate Proehl's cross-examination testimony related to her opinion that her diagnosis of Mrs. Memic would have changed had she known all of the facts surrounding the incident of April 10, 2004, or had she known that Mrs. Memic had previously been under psychiatric treatment for severe depression. We disagree.
 {¶ 62} A review of the record reveals that all of the facts upon which Proehl based her opinion were supported by the testimony of other witnesses during the trial, and were elicited based upon questioning during cross-examination. Evid. R. 703 provides that "the facts * * * upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." (Emphasis added). Thus, the trial court did not err in admitting Proehl's opinion testimony.
 {¶ 63} Mrs. Memic's fourth and fifth assignments of error are without merit.
 {¶ 64} In her third assignment of error, Mrs. Memic argues that the magistrate should have been disqualified since he was exposed to circumstances which may have required him to be a witness in a potential criminal case against her. We disagree.
 {¶ 65} We note, at the outset, that the removal of a magistrate is within the sound discretion of the trial judge referring the matter to the magistrate. In re Disqualification of Wilson (1996),77 Ohio St.3d 1250, 1251 (citation omitted).
 {¶ 66} While Civ.R. 53 empowers a court to appoint magistrates, the rule does not address the issue of disqualification. Unger v. Unger
(Dec. 29, 2000), 12th Dist. No. CA2000-04-009, 2000 Ohio App. LEXIS 6230, at *6. Moreover, there is no specific provision in the Ohio Revised Code governing the removal of magistrates, since R.C. 2701.03 is expressly limited to the disqualification of common pleas judges and cannot be used to disqualify a magistrate. Id. citing In reDisqualification of Light (1988), 36 Ohio St.3d 604; Gatliff v.Gatliff (Feb. 11, 1985), 12th Dist. No. CA84-08-049, 1985 Ohio App. LEXIS 6077, at *8.
 {¶ 67} If a party has concerns about potential bias or prejudice of the magistrate, "the proper vehicle for relief when seeking the removal of a magistrate is 'a motion for disqualification * * * filed with the court.'" Unger, 2000 Ohio App. LEXIS 6230, at *7 (citation omitted);Reece v. Reece (Jun. 22, 1994), 2nd Dist. No. 93-CA-45, 1994 Ohio App. LEXIS 2791, at *5-*6.
 {¶ 68} In the interest of justice, other appellate courts have permitted the motion for disqualification to be raised "in the form of objections contemplated by Civ.R. 53(E)(2)," Reece, 1994 Ohio App. LEXIS 2791, at *6; Unger, 2000 Ohio App. LEXIS 6230, at *4. Here, Mrs. Memic raised an objection on the record on February 14, 2005, following the recess during which the incident involving Ms. Werner and Mr. Memic's attorney occurred.[1] Mrs. Memic raised this issue again in her objections to the magistrate's decision. The "potential criminal case" to which Mrs. Memic refers is the charge of Aggravated Menacing against her resulting from the aforementioned incident.
 {¶ 69} Although we could, under the circumstances, conclude that Mrs. Memic's objections were untimely, since a motion could have been filed well before the conclusion of the trial, we will nevertheless address the merits of her argument here.
 {¶ 70} Canon 3 of the Code of Judicial Conduct sets forth the grounds upon which judges and magistrates are subject to disqualification or recusal. Unger, 2000 Ohio App. LEXIS 6230, at *2-*5.
 {¶ 71} The Canon provides, in relevant part, that a magistrate shall be disqualified in a proceeding in which the magistrate's "impartiality might reasonably be questioned, including * * * instances where * * * [the magistrate] * * * [i]s * * * likely to be a material witness in theproceeding." Canon 3(E)(1)(d)(v) of the Code of Judicial Conduct (emphasis added).
 {¶ 72} A plain reading of the Canon indicates that the grounds for disqualification and recusal are limited to those situations in which a magistrate would be a material witness to the proceeding being heardbefore him, rather than a separate criminal proceeding which mayresult from incidents which happen to occur within the courtroom. Accordingly, there are no cognizable grounds under Canon 3 under which the trial court would have been required to disqualify the magistrate, and the trial court did not abuse its discretion by overruling Mrs. Memic's objections on this basis.
 {¶ 73} Mrs. Memic's third assignment of error is without merit.
 {¶ 74} For the foregoing reasons, we affirm the judgment of the Lake County Court of Common Pleas, Juvenile Division.
[1] February 14, 2005 was the first day of trial. Following a continuance, the three-day trial concluded on May 12, 2005.