OPINION
{¶ 1} Appellant Brian Brown appeals the decision of the Mahoning County Juvenile Court which terminated the prior shared parenting agreement and named appellee Crystal Brown the residential parent of the parties' two sons whom the parties had previously stipulated were dependent. Mr. Brown claims that this change of custody is an abuse of discretion and against the manifest weight of the evidence. He then claims that the children's best interests required the court to impose some type of monitoring over Ms. Brown. He also alleges that the guardian ad litem should have *Page 3 
been discharged due to bias. For the following reasons, the judgment of the juvenile court is affirmed.
 STATEMENT OF THE CASE {¶ 2} The parties were married and moved to Ohio from Maryland in 1999. They had two sons, born August 11, 2000 and June 22, 2001. The parties permanently separated in late 2002. Mr. Brown initiated dissolution proceedings in the domestic relations court in January 2003. Ms. Brown then filed for divorce in March 2003.
 {¶ 3} Within days, Mr. Brown made a referral to Mahoning County Children Services Board (CSB) claiming that Ms. Brown pulled the oldest child's arm from his socket one or two years ago. He also alleged that the children often have bruises, are dirty and sleep on the floor with trash. His allegations were found to be unsubstantiated and the dislocated arm was found to be due to actions other than abuse combined with the child's overly susceptible arm. (Tr. 986). It was noted that the child's arm was also dislocated once when Mr. Brown's mother was holding his hand. Other allegations by Mr. Brown followed, including not only physical abuse but also sexual abuse.
 {¶ 4} For instance, Mr. Brown made a referral on October 8, 2003 due to the oldest child having bruises. The father stated that the child told him that Ms. Brown caused the bruises when she beat him. When the child was interviewed, however, he stated that his younger brother had hit him. The allegations against Ms. Brown were found to be unsubstantiated. (Tr. 987). Later that month, Mr. Brown called CSB about marks on this same child's buttocks.
 {¶ 5} On November 7, 2003, Mr. Brown made a referral because the oldest child had a mark on his penis and was telling his paternal grandmother that "Mommy" did it. Neither the emergency room doctor nor the Austintown Police believed that abuse occurred. (Tr. 988). Mr. Brown then filed an ex parte motion in the domestic relations court, which was initially granted. After a hearing, however, the order was dissolved.
 {¶ 6} Notwithstanding this history, the court entered a divorce decree on December 8, 2003, which incorporated a shared parenting plan. The parties' agreed *Page 4 
to alternate their residential parent status each week. Then, on January 23, 2004, there was another referral when the youngest child stated that his mother put something in his rectum. They were at the doctor's office at the time, but the child would not repeat the allegation to the doctor. (Tr. 991-992).
 {¶ 7} On February 9, 2004, Mr. Brown made a referral stating that when the children were in the shower, the younger child put his finger in the older child's rectum. He claimed that the children told him they learned this from Ms. Brown. In an interview, one child said the mother did it, and one child said the father did it. (Tr. 992). Subsequently, the older child disclosed that they learned the behavior from daycare. (Tr. 993).
 {¶ 8} On February 28, 2004, Mr. Brown's mother filed a police report in Austintown claiming that while the boys were staying with her over a four-day period, they revealed various instances of abuse. She said while changing the younger child's diaper, he called his crotch a "pussy" and said his mother told him the word. During another diaper change, she stated that he told her that "Mommy" sticks her finger in his "butthole" and plays with his "pee-pee."
 {¶ 9} Mr. Brown's mother also complained that the older child advised her that Ms. Brown pushes his bellybutton and squeezes his cheeks when he does or says something wrong. She opined that a mother caressing her three-year-old son's upper body is inappropriately sensual and sexual. When the child described these caresses, Mr. Brown's mother told the child that he should not let his mother play "body games." Notably, she attributed this same phrase to what this child later allegedly said his mother does to him.
 {¶ 10} A few days later, Mr. Brown's mother videotaped the children in an attempt to record statements by the children incriminating Ms. Brown. While the grandmother was changing the youngest child's diaper, she said he was batting at his penis that appeared to be erect. She asked him who touches him and then "repeated" the child's answer that it was "Mommy." (Tr. 689). In cross-examination, it was pointed out that the video showed that she did not actually change the child's diaper as she put the same diaper back on, that she held the child's legs open and that she may have put words in the child's mouth. Upon hearing the questioning of his younger *Page 5 
brother, the older child then pulls his pants down and touches himself. In cross-examination, it was pointed out that the grandmother helped him pull his pants down for better access. (Tr. 695).
 {¶ 11} The children were officially interviewed. The youngest, then less than three years of age, was found to be too young with insufficient verbal skills to be interviewed. The oldest, then under four years of age, said that his mother touched his penis, but he could not disclose details or confirm that it was done other than during proper care. (Tr. 999). He later denied anyone touched the body parts shown to him on a chart. (Tr. 1021). This was typical of the interviews throughout. (Tr. 1019).
 {¶ 12} Based upon the video, Mr. Brown obtained an ex parte order in domestic relations court. However, this order was dissolved after a hearing. Mr. Brown states that he asked the domestic relations court to replace the guardian ad litem due to bias, but his motion was denied.
 {¶ 13} The Austintown Police also did not find the videotape to be credible evidence. Ms. Brown submitted to a voice stress analysis regarding the allegations of sexual abuse, and it was determined that she was not being deceptive. Mr. Brown's test, however, revealed that he was being deceptive on the questions regarding coaching the children to make false accusations against Ms. Brown.
 {¶ 14} On April 25, 2004, Mr. Brown brought the children to the emergency room because they stated their mother licked their penises and the social worker's notes reflected his allegation. (Tr. 1003). When the police interviewed Mr. Brown, however, most of his concern was about a bruise on the youngest child's back. He noted that he had the doctor check for sexual abuse but only because the daycare worker told him the boys were touching themselves inappropriately. This daycare worker advised investigators that the boys were always hitting and biting each other.
 {¶ 15} On May 25, 2004, Mr. Brown went to the Austintown Police and said that the children told the daycare worker that they learned certain behavior such as grabbing themselves and smelling each other's bottoms from their mother. He then audiotaped the children saying that "Mommy" bit their "pee-pees." On June 2, 2004, Ms. Brown called CSB and disclosed that when she asked her older son why he was sexually acting out, he said his father told him to. (Tr. 1035). *Page 6 
 {¶ 16} Thereafter, Mr. Brown called CSB to complain that Ms. Brown brought the children to a festival with runny noses. Mr. Brown then alleged that the older child had a sexually transmitted disease that turned out to be a common childhood skin condition for which the child had already seen a dermatologist. (Tr. 1041-1042).
 {¶ 17} On June 25, 2004, CSB filed a dependency complaint in the juvenile court. Thus, the domestic relations court discontinued its proceedings. The grounds for the complaint were Mr. Brown's continued referrals of unsubstantiated sexual abuse, his repeated questioning of the children and his subjection of the children to multiple physical examinations, all of which put the children at risk for emotional abuse. On July 8, 2004, the parties stipulated to a dependency adjudication. The magistrate allowed the shared parenting plan to remain in effect pending final disposition but ordered that CSB exercise protective supervision through monitoring as well.
 {¶ 18} At the same time, Mr. Brown alleged that the oldest child said his mother injured his genital area. Ms. Brown stated that the child injured himself on a vacuum cleaner, and the injury was found to be consistent with this explanation. At a session with Dr. Kovalcik, the older child revealed that his father told him to say that his mother licked his "pee-pee." (Tr. 1018). It was also noted that daddy would buy him a swimming pool from Sam's Club if he said what he should. Dr. Kovalcik opined that he never saw a better example of coaching. (Tr. 388).
 {¶ 19} In March 2005, Mr. Brown brought the older child to the emergency room due to a small bruise above his eye, which Ms. Brown stated was caused by the younger child hitting him with a water bottle. The injured child admitted to police that his younger brother caused his injury but that his father told him to say his mother did it. The treating physician countered Mr. Brown's claim that the younger brother could not have caused this injury. (Tr. 976).
 {¶ 20} Dispositional hearings were held on January 19, 20 and 27, February 7 and 11, and June 20, 24 and 27, 2005. Ms. Brown testified that she did not sexually abuse her children. (Tr. 1319, 1326). Concerning the parties' history, she explained: she dated Mr. Brown in Maryland when she was very young; he moved to Ohio for a few years; he moved back; he told her he was gay or bisexual; they developed *Page 7 
feelings for each other again; he stated that he wanted a wife and children instead of a gay lifestyle; and she agreed to marry him because she was in love with him. During the marriage, Ms. Brown was worried about strange telephone calls and e-mails Mr. Brown would receive from men. She also expressed concern with homosexual pornography he kept; he reminded her that he was bisexual and told her not to worry because she was his wife.
 {¶ 21} Ms. Brown opined that Mr. Brown and his mother are too close. She also claimed that Mr. Brown's mother once told her that she was touched inappropriately as a child. (Tr. 1326). She wonders if maybe Mr. Brown sexually abused the boys, reasoning that if the court concludes that abuse is the only explanation for their behavior, then he and his mother were the only other adults who could have done so as she insisted that she did not abuse them. (Tr. 1313, 1319).
 {¶ 22} At trial, Ms. Brown was also asked about her daughter, born January 3, 1997, from her prior marriage. After moving to Ohio with Mr. Brown, she had shared custody pursuant to a Maryland order, which was to convert to give her sole custody once the child began public school. The daughter demonstrated behavioral problems, which Mr. Brown worried could result in injury to his new son. (Tr. 220). When the daughter was three years old, Mr. Brown claimed that while he was giving his stepdaughter a bath, she disclosed that her maternal grandmother, Ms. Brown's mother, sexually abused her while visiting in Maryland. Ms. Brown testified that since she did not believe her mother could engage in such behavior, Mr. Brown videotaped the daughter making the allegations. He then pressured her to call the police, after voicing his disgust that she would disbelieve her own daughter. (Tr. 1336-1337). An examination revealed possible signs of abuse due to labial adhesions, but testimony showed this could have also been explained by other causes. The sexual abuse allegations against Ms. Brown's mother were found to be unsubstantiated by Maryland authorities.
 {¶ 23} Thereafter, Mr. Brown stopped letting Ms. Brown use the car to transport her daughter to visitation in Maryland as ordered by the court. Thus, Ms. Brown's ex-husband filed motions in Maryland regarding custody. Due to giving birth to her youngest child three days before, Ms. Brown could not appear at an important hearing *Page 8 
in Maryland in June 2001. She provided a note from her obstetrician weeks in advance explaining the situation, but the court proceeded in her absence. Custody was changed to the ex-husband, and no visitation was ordered for Ms. Brown due to her failure to submit to Maryland's jurisdiction.
 {¶ 24} In August 2001, the daughter thus moved to her father's in Maryland. Ms. Brown states that she speaks to her daughter on the telephone and recently visited her at Christmas. (Tr. 70). Due to the current allegations against her by Mr. Brown, she now firmly believes that he also coached her daughter to make the allegations against her mother.
 {¶ 25} Ms. Brown was asked about a prior bi-polar diagnosis. She stated that Mr. Brown talked her into seeing Dr. Durner in early 2001. She was pregnant with her second child and upset about the custody and alleged abuse situation with her daughter. She claimed that Mr. Brown did all the talking and she went along with his description of her condition in order to save her marriage. (Tr. 57, 76). She took medication for depression thereafter. Later evaluations found that she was not bipolar but merely had an adjustment disorder and depression due to her current life situation. (Tr. 56, 65-66, 1618).
 {¶ 26} Mr. Brown also testified. As to his general credibility, it was pointed out that he was not working and that his application for his last job contained falsehoods that constituted grounds for dismissal. Specifically, since he worked for the family business, the Shepherd's Guide, he used his mother as a reference. However, the application stated that relatives could not be used as references. Thus, he used his mother's maiden name and claimed he knew her for seven plus years. (Tr. 720).
 {¶ 27} Mr. Brown testified that for the six months after the parties' separation, the youngest child had night terrors while with him. (Tr. 304-305). He testified that in that same time frame, the oldest child occasionally lost his potty-training skills. (Tr. 306). He also admitted that a man (who has since died while in the process of shoplifting) and that man's girlfriend (who is now Mr. Brown's fiancée) lived in the marital residence and remained there for at least a few months after Ms. Brown moved out. (Tr. 401-405). He expressed concern about his children touching themselves and denied being told by the family physician that this was normal behavior. *Page 9 
 {¶ 28} As for the source of some physical injuries, he conceded that the children often beat each other and cause each other to suffer bruises. (Tr. 310). Testimony advised that the youngest child may have ADHD but was too young for actual diagnosis. (Tr. 1624). There were also concerns of lead toxicity due to paint on Mr. Brown's window sills. Mr. Brown further explained that the children were removed from a home daycare for behavior issues, showed aggressive behavior at his chosen preschool, New Life Assembly of God, and have now been temporarily withdrawn or delayed for reenrollment due to their aggression. (Tr. 313, 834). He then revealed that he previously went to counseling due to his pastor making sexual advances on him when he was in his early twenties (this was alternatively described as sexual abuse and being taken advantage of). He also said that he was once prescribed a medication to calm him during the time they were making allegations about Ms. Brown's daughter. (Tr. 325-327). As the magistrate characterized it, he wanted to hold Ms. Brown's mental health issues against her but to attribute no significance to his own.
 {¶ 29} As for specific instances of abuse, the first incident he allegedly witnessed was when the children were in the shower and the youngest child (2.5 years old) repeatedly put his whole finger in the oldest child's (3.5 years old) rectum. He claimed they blamed it on their mother. (Tr. 308). He stated that the oldest did not act as if it hurt, and he did not have the child's rectum evaluated thereafter. (Tr. 342). He opined that the children engage in other inappropriate behavior such as smelling each other's rear ends. (Tr. 331). He also stated that while preparing to enter the bathtub, the youngest child shook his bottom and said, "Oh yeah" while he spanked himself. (Tr. 334). He testified that on two occasions, his oldest child blamed his mother when asked about why his penis was red or inflamed. (Tr. 429-431). When questioned about each of the referrals, he could not recall having made some of them. (Tr. 396). It was also disclosed that the children currently call his mother "Ma-maw" and that they previously referred to her as "Mommy." (Tr. 465).
 {¶ 30} Mr. Brown's mother, the paternal grandmother of the children, testified that she is one of the children's caregivers. She stated that both children had night terrors after the separation. (Tr. 484-487). She stated that they also became *Page 10 
extremely aggressive and less happy at this same time. (Tr. 490-492, 498-499). The grandmother also testified that the children began using swear words including "fucker." (Tr. 499). She expressed concern that the youngest child became fascinated with bowel movements and would ask to see his diaper after being changed. (Tr. 494). She also worried that the children often touched their private parts or play-acted like they were having anal sex. (Tr. 494-495).
 {¶ 31} She related that the youngest child once stated that his "pee-pee" hurts because it was growing. (Tr. 497). She stated that in November 2003, the oldest child's penis looked red, inflamed and was erect. She asked what happened, and he responded, "Mommy hurt me. Mommy did it. Mommy touched me there." (Tr. 517). This resulted in the November 2003 police report. She also testified to the statements the children allegedly made that she reported to the police in February 2004. She explained that she videotaped the children for evidence and stated that the video showed the oldest child rubbing his penis and saying that is what "Mommy" does. (Tr. 576). She also related that the oldest child told her more than once that his mother bit his penis. (Tr. 582, 584).
 {¶ 32} This paternal grandmother also revealed that her son once brought Ms. Brown's daughter to her so that she could hear the allegations the child made against her maternal grandmother. She disclosed that she was there when Mr. Brown made a videotape of his step-daughter's allegations while Ms. Brown was at work.
 {¶ 33} Mr. Brown's chosen psychologist, Dr. Leach, testified that from his evaluation and administration of the MMPI-II it is unlikely that Ms. Brown is bi-polar. (Tr. 126). Mr. Brown's testing showed that he was extremely defensive. Dr. Leach also opined that Mr. Brown's claims that he did not coach the children were not credible. (Tr. 105-106). He explained, however, that he could not determine if Mr. Brown coached them to tell the truth, coached them to tell what he believes is the truth or maliciously coached them to tell lies. (Tr. 129, 144-145). He noted that some of the children's improper behavior is likely reinforced by all the attention the caregivers place upon it. (Tr. 124). He pointed out that acting out in sexual ways does not equate with sexual abuse. (Tr. 123). Dr. Leach also acknowledged that a person who is unsure of their sexual identity could "see the bogeyman under every bed." (Tr. 132). *Page 11 
 {¶ 34} Dr. Kovalcik, who evaluated the oldest child due to an injury in the genital area in July 2004, testified that before any interview even began, the child spontaneously (and suspiciously) offered allegations against his mother such as that she hurt his penis. (Tr. 758-759). The interviewer continued with her established routine of determining the child's developmental stage. Later, when the conversation was redirected to the child's injury, the child stated that he had been running with a vacuum cleaner attachment and fell. When asked if his mother or anyone else ever hurt his penis, he responded negatively. The child also disclosed that his father told him to say his mother hurt him. (Tr. 762).
 {¶ 35} The child later repeated to the doctor that his father told him to say his mother bit his penis. (Tr. 762-763). The child then revealed that his father would buy him a swimming pool from Sam's Club if he talked to the doctor. (Tr. 803-804). Dr. Kovalcik found that the child had clearly been coached, and he found that the coaching constituted emotional abuse considering the history of the case. (Tr. 800, 805). He also noted that the child's injury was consistent with falling on the vacuum attachment, which the mother brought to him for comparison purposes. (Tr. 768).
 {¶ 36} A detective testified about the voice stress analysis and opined that Mr. Brown was deceptive in his answers to the questions asking if he ever told his children to lie about Ms. Brown and if he coached his children into making false sexual allegations against Ms. Brown. (Tr. 891-892). He explained that his findings were confirmed by two independent operators from another police department. (Tr. 892).
 {¶ 37} The guardian ad litem testified as to her recommendations that shared parenting be terminated and that Ms. Brown be designated the residential parent. (Tr. 1630). Various reports from the guardian ad litem were admitted outlining the history and recommendations. The magistrate heard much other testimony such as from counselors, physicians and CSB agents. For instance, one psychologist testified about the effect of coaching on young children's realities. (Tr. 1408). He also mentioned supervised visitation for the coaching parent. (Tr. 1423).
 {¶ 38} On July 21, 2005, the magistrate released her decision, finding Mr. Brown and his mother to lack credibility. The magistrate found that the videotape of the children made by the paternal grandmother represented a blatant act of staging *Page 12 
and coaching. The magistrate then found the opinions on Mr. Brown's coaching to be credible and noted the limited verbal ability of the children. The magistrate pointed out how during one referral each child claimed that a different parent abused them and noted that the oldest disclosed to a counselor that he learned the sexual behavior at school. The magistrate made note of the lack of details the oldest could give and the contradictory stories about each allegation. The magistrate suggested that Mr. Brown's belief that normal young children do not touch themselves may have sparked his exposure of them to sexual and leading questioning and subsequent evaluations which all reinforced the behavior in the children. As to Ms. Brown, the magistrate found that the evidence established that she was not bi-polar and that she could adequately parent her children.
 {¶ 39} Thus, the magistrate recommended termination of shared parenting and found that it was in the children's best interests for Ms. Brown to be named residential parent and for Mr. Brown to receive standard visitation. A caveat was added that if Mr. Brown continues to make false allegations of sexual abuse, his visitation rights should be supervised or limited. For child support purposes, Mr. Brown was found to be voluntarily unemployed.
 {¶ 40} Mr. Brown filed objections with the trial court on August 4, 2005. Various continuances were granted until the court finally heard the objections on May 9, 2006. Thereafter, on August 9, 2006, the juvenile court affirmed the magistrate's decision in main part, making findings with regards to each of the eight objections. However, the court changed Mr. Brown's visitation to supervised and ordered protective supervision over the children while in the care and custody of Mr. Brown. As to Mr. Brown's complaint about the magistrate's failure to order mental health counseling, the court granted such request and ordered mental health counseling for the children to begin immediately.
 {¶ 41} Mr. Brown [hereinafter appellant] filed timely notice of appeal. We requested the juvenile court to provide a final order since the judgment entry failed to state that the shared parenting was terminated or that the mother was named the residential parent. The juvenile court entered its amended entry adding such features *Page 13 
on October 18, 2006. Appellant then received various extensions to file his brief, and the case is now before us.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 42} Appellant's first assignment of error contends:
 {¶ 43} "THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF THE APPELLANT-FATHER IN NAMING THE APPELLEE-MOTHER THE PRIMARY RESIDENTIAL PARENT OF THE PARTIES' MINOR CHILDREN AS THE TERMINATION OF THE SHARED PARENTING PLAN AND THE CHANGE OF CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 44} Appellant generally urges that the juvenile court's decision on custody was unreasonable and was contrary to the manifest weight of the evidence. He acknowledges that preponderance of the evidence is the test in reviewing the weight of the evidence here and that an award of custody can be reversed for an abuse of discretion. See In re Nice
(2001), 141 Ohio App.3d 445, 455 (7th Dist.); R.C. 2151.355(A)(3). Specifically, he urges that evidence showed that Ms. Brown was bipolar and that she abused the children. He notes that the lack of physical evidence of sexual abuse does not mean that abuse did not occur. He contends that the court improperly discounted the children's statements about their abuse to him and others. He claims that there was no evidence that he coached the children. He also complains that Dr. Leach was unable to meet with the children due to Ms. Brown's condition that he speak to her first.
 {¶ 45} Weight to be given the evidence and the credibility of witnesses are primarily matters for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, 231. When addressing a trial court's decision on such matters, this court is guided by the presumption that the findings of the trial court were correct. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. The rationale for this presumption is that the trial court is in the best position to view witnesses and observe their demeanor, voice inflection, and gestures. Id. Judgments supported by some competent, credible evidence will not be reversed on appeal as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 280. Furthermore, when there are two views of the evidence or two conflicting versions of *Page 14 
events, neither of which is unbelievable, it is not our province to choose which one should be believed. State v. Gore (1999),131 Ohio App.3d 197, 201.
 {¶ 46} Here, the court believed Ms. Brown's pronouncement that she did not sexually abuse her children. The court also believed Ms. Brown's testimony that her latest evaluations established that she was not bi-polar. The court disbelieved Mr. Brown's claims regarding the children's accusations. The court also disbelieved the claims of Mr. Brown's mother. The court found that Mr. Brown coached his children to make false allegations. The court found a videotape to be obviously staged and coached.
 {¶ 47} A multitude of testimony supported these conclusions. We reviewed this testimony supra within our statement of the case after studying over sixteen hundred pages of transcript. For instance, Dr. Kovalcik testified as to his belief that appellant coached the oldest child due to the child's own revelations of such coaching. (Tr. 758-763, 800-805). Other evidence on coaching was received such as the videotape that was found to be staged. Additionally, general explanations were provided on how coaching and leading questions can confuse a child as to reality.
 {¶ 48} Appellant's complaint that a lack of physical evidence of sexual abuse is irrelevant is incorrect. To the contrary, the lack of such evidence may not be dispositive or overriding, but it is still relevant in both the evidentiary and everyday sense of the word and can be considered as one of many factors. Dr. Kovalcik properly explained that a lack of physical evidence does not allow abuse to be ruled out. (Tr. 770-771, 780). Still, this does not preclude him from stating that he found no physical evidence of abuse.
 {¶ 49} As to Ms. Brown's mental health, she testified that her most recent psychologist and a counselor found that she was not bi-polar. (Tr. 56, 65-66). Even appellant's expert testified that Ms. Brown was not likely bi-polar. (Tr. 126). Her testimony about how she may have come to be diagnosed need not be considered incredible. That is, she explained that in order to save her marriage, she succumbed to appellant's demands to see a mental health professional where he "did all the talking" and where she refrained from disputing his descriptions of her character. (Tr. 57, 76). *Page 15 
 {¶ 50} In conclusion, the court viewed the witnesses' demeanor, voice inflections and gestures as they testified. Ms. Brown's testimony and that of the witnesses that supported her position could not be described as incredible or unworthy of belief. With the parties' history and the facts of the case, discontinuation of shared parenting was reasonable. Cooperation is nonexistent. Both consistency in residence and restriction of time with appellant have become desirable. Considering the facts found, the triers of fact below could validly determine that the children were at risk of emotional abuse by Mr. Brown. This risk derived from the continual referrals, interviews and evaluations that were found to have resulted from Mr. Brown's coaching of false stories, whether maliciously or unintentionally (due to his misinterpretation of the toddlers' actions and his posing of leading questions). Hence, there is some competent and credible evidence to support the decision rendered to award custody to Ms. Brown.
 {¶ 51} Appellant also argues here that the court erred because the children were not evaluated by his expert. On September 20, 2004, the magistrate granted his motion for psychological evaluations but stated that the children were not to be examined without prior consent of the court. Appellant's expert testified at the January 19, 2005 hearing. The expert stated that he did not realize that he needed to evaluate the children until a week before the hearing due to his need to speak to others first. (Tr. 152). He stated that Ms. Brown gave clearance to speak to the children's counselor only if he would speak to her first. (Tr. 153). There is no indication that such request is unreasonable for a mother to make, and the expert complied with her request. The expert then stated that he spoke to the children's prior counselor but ran out of time to speak with the children. (Tr. 154).
 {¶ 52} When it became apparent that the dispositional hearing would be continued, appellant filed a motion on February 16, 2005, asking that the expert be permitted to evaluate the children. The magistrate denied the motion. The court upheld this denial upon reviewing appellant's objections noting that the expert did not indicate that he was not prepared to testify.
 {¶ 53} This decision was not unreasonable. Appellant's expert's testimony was completed almost a month before he asked for the evaluation of the children. *Page 16 
Appellant and the expert knew since September 20, 2004 that court approval was needed for evaluation of the children. If the expert was not prepared in the absence of such evaluation, the court should have been notified before calling the expert. (Tr. 77-82). Appellant could have called other witnesses (such as himself, his mother, a counselor and a treating psychologist) prior to this expert to give him more time as well.
 {¶ 54} As the trial court pointed out, the magistrate heard much other evidence from those who had evaluated the children. Furthermore, the magistrate was rightfully concerned with the children's welfare in constant exposure to evaluations. Finally, we note that appellant refrains from mentioning that when he initially filed the motion for a psychological evaluation, the magistrate noted in a September 10, 2004 entry, that the court previously heard the matter when appellant had prior counsel. The magistrate explained that the parties entered an agreement at the adjudication hearing regarding the continued need for examinations of the children. The magistrate pointed out that appellant cannot ignore the agreement merely because he changed counsel. For all of these reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 55} Appellant's second assignment of error alleges:
 {¶ 56} "THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF THE APPELLANT-FATHER BY FAILING TO REQUIRE THE GUARDIAN AD LITEM TO FAITHFULLY DISCHARGE HER DUTIES WITHOUT BIAS OR PREJUDICE."
 {¶ 57} Here, appellant claims that the guardian ad litem was biased against him and thus failed to faithfully discharge her duties as required by R.C. 2151.28(D), which allows the court to discharge the guardian ad litem. He charges that the guardian ad litem had strong opinions and attempted to sway the opinions of appellant's counselor and his chosen psychological expert.
 {¶ 58} However, appellant fails to cite to the record as to where he raised this issue to the juvenile court or to its magistrate. This is a problem for our purposes. See App.R. 12(A)(2) (can disregard assignment of error if fail to identify in record error on *Page 17 
which assignment of error is based) and 16(A)(3),(6),(7) (brief must refer to appropriate places in record).
 {¶ 59} Moreover, in his statement of facts, he states that he moved to recuse the guardian ad litem on May 18, 2004 and was denied on June 2, 2004. However, any such motion must have been filed and denied in the domestic relations case because this juvenile case did not arise until the dependency complaint was filed on June 25, 2004. Thus, such denial was not an error of the juvenile court. Rather, he should have refiled his motion regarding the guardian ad litem in the juvenile court.
 {¶ 60} Furthermore, as to his general allegations about the guardian ad litem (possibly with regards to certain testimony that she seemed to have an emotional investment in the case), appellant failed to raise these allegations as an objection to the trial court. An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection. Juv.R. 40(D)(3)(b)(ii). Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion (whether or not specifically designated as a finding of fact or conclusion of law) unless the party has properly objected to that finding or conclusion. Juv.R. 40(D)(3)(b)(iv). Appellant failed to object to the magistrate's reliance on the guardian ad litem's testimony or reports and failed to raise any issue with the trial court regarding the guardian ad litem's alleged bias. As such, Juv.R. 40 also presents an obstacle here.
 {¶ 61} Finally, there is no error apparent, plain or otherwise. There is no indication of prejudice or bias in the multiple guardian ad litem reports reviewed by this court, nor does her testimony establish any failure to faithfully discharge duties. Appellant points to his expert's testimony that when he spoke to the guardian ad litem just weeks before trial, she had a strongly held opinion about appellant coaching his children. (Tr. 116). Appellant also notes that his counselor testified that the guardian ad litem "probably [had] some strong feelings." (Tr. 175). Appellant states that everyone involved, including the guardian ad litem, instructed him to stop reporting allegations of abuse. Although her report details statements of the children's first daycare provider and relates that she spoke to the new school, appellant complains *Page 18 
that she did not question their new school more thoroughly as there are still behavior problems.
 {¶ 62} The guardian ad litem's duty is to protect the best interests of the children. See R.C. 2151.281(I). The best interests here essentially revolve around whether their father is coaching them to lie or whether they have been sexually abused. This is the crux of the investigation. Even if some newer aspects of the children's school lives could have been investigated deeper, there is no indication that such investigation was necessary to answer the coaching or abuse inquiries. If someone at the new preschool told the guardian ad litem there were major improvements with the children's behavior but appellant believes there were not, then he could and in fact did dispute this with testimony. We must also point out that the trial here spanned a six-month period, and much of appellant's current investigative complaints have much to do with the period after the trial began.
 {¶ 63} Additionally, the guardian ad litem is required to formulate an opinion on the issues and is permitted to recommend a disposition. Multiple participants in various fields concluded that appellant was coaching his children to make false allegations. The guardian ad litem concurred in these opinions and allegedly proceeded to voice her opinion to new participants who contacted her for information. Contrary to appellant's suggestion, the guardian ad litem is not to remain a neutral third party. See In re Pryor (1993) 86 Ohio App.3d 327 (guardian ad litem appointed for child has no duty whatsoever to protect parental interests in retaining child custody). Rather, she was the children's advocate. She must promote their best interests. Protecting the children's best interests often requires having a strong opinion. An opinion that one parent is coaching the children does not result in a presumption that the guardian failed to faithfully discharge her duties. As such, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 64} Appellant's third and final assignment of error provides:
 {¶ 65} "THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF THE APPELLANT-FATHER WHEN THE COURT FAILED TO APPLY THE BEST *Page 19 
INTEREST OF THE CHILD STANDARD PRIOR TO TERMINATING PROTECTIVE SUPERVISION OF THE CHILDREN."
 {¶ 66} Appellant concludes by arguing that the court abused its discretion by failing to maintain some type of protective supervision over the children so that CSB could monitor them while in the custody of their mother. He urges that such intermittent observation is in the best interests of the children. He bases his conclusion on his concern that Ms. Brown is bi-polar, that there is a possibility that she in fact sexually abused the children, and that she testified that she never believed that her own mother abused her daughter, but still she pursued accusations against her mother. He notes that such supervision is made more important due to the fact that he has been instructed not to report suspected abuse.
 {¶ 67} We already addressed the argument about Ms. Brown's mental health. We add here that, contrary to appellant's assertion, it is not Ms. Brown who is confused about her diagnosis. Rather, it was a conflict of professional opinions. The opinion that diagnosed her in the first place was based mainly on descriptions of Ms. Brown's condition provided by appellant himself. She testified that he "did all the talking" and that she did not dispute his characterizations of her behavior because she was both depressed about her daughter and trying to save her marriage. A counselor seen immediately after diagnosis did not feel that Ms. Brown was bi-polar. Her most recent psychologist found that she is not bi-polar, and appellant's own expert opined that she is likely not suffering bi-polar disorder.
 {¶ 68} Next, the fact that Ms. Brown testified that she never believed that her mother sexually abused her daughter does not place her in the unfavorable light that appellant claims. In fact, the allegations against Ms. Brown's mother were found to be unsubstantiated. As Ms. Brown testified, appellant was the one who coaxed the vague allegations from the daughter, the one who created a videotape of the allegations and the one who pressured Ms. Brown to report the allegations by warning that he could not stay married to or have children with someone who refused to pursue the serious accusations. Her point in testifying that she never believed that her mother was guilty of abuse served to substantiate her claim that appellant coached her sons as he most *Page 20 
likely coached her daughter and that he could talk others into believing the results of his coaching.
 {¶ 69} Finally, Mr. Brown was only warned to discontinue makingfalse allegations. The juvenile court explained the difference to him in its judgment entry. This warning was found to be necessary to prevent further emotional manipulation. As we outlined above, the juvenile court found that Ms. Brown did not sexually abuse the children and that appellant coached the children to tell lies about their mother. We refer here to the analysis under assignment of error number one about the court's findings and conclusions. We already found that the court's determinations were neither unreasonable nor contrary to the manifest weight of the evidence. With these findings upheld, there is no need to impose monitoring over the mother. Moreover, the trial court added that the children shall attend mental health counseling. Thus, some oversight was in fact imposed as this counselor has an obligation to report abuse. This assignment of error is without merit.
 {¶ 70} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1