OPINION
{¶ 1} Appellant, Pauline Meeker, appeals the judgment of the Trumbull County Court of Common Pleas, Division of Domestic Relations, Juvenile Department, awarding permanent custody of her two youngest children to Trumbull County Children *Page 2 
Services Board (TCCSB); she also appeals the court's judgment to place her three remaining children into foster care rather than returning them to the family home. For the reasons herein, we affirm.
 {¶ 2} Johnathon Chicase, born January 11, 1997, Alexander Jacobs, born September 11, 1999, Steven Meeker, born November 30, 2000, and Robert and Nicolas Meeker, born October 16, 2003 are the biological children of Mrs. Meeker. John Chicase is the biological father of Johnathon, Alexander's biological father is unknown, and, appellant's husband, Robert Meeker, is the biological father of Steven and the twin boys, Robert and Nicolas. On October 31, 2000, the Meekers were married. At all times, each of the five children recognized Robert Meeker as their father. John Chicase has had virtually no contact with Johnathon. Mr. Meeker, the sole wage earner in the family, works full time as a truck driver and makes regular overnight hauls which cause him to be away from the home frequently. Mrs. Meeker, on the other hand, is a "stay-at-home" mother.
 {¶ 3} On November 19, 2002, Johnathon, Alexander, and Steven were adjudicated dependent in Mahoning County, Ohio due to living conditions which fell below minimal standards of safety and cleanliness. Although the Meekers sporadically met the standards set forth in their case plan(s), they were unable to keep a consistently safe and healthy home environment for their children. In August of 2003, the case was transferred to TCCSB under the existing protective supervision order (PSO) after the family relocated to Trumbull County. *Page 3 
 {¶ 4} Several months after the case was transferred to TCCSB, on January 14, 2004, the Meeker's case worker, Lynn Alderman, visited the family's residence, a trailer, and found it in a significantly cluttered and unsafe condition. Pictures of the home revealed debris completely blocking the hallway which connected the front of the residence to the rear; further, the kitchen, living room, and children's bedroom were unacceptably dirty and in complete disorder. The pictures revealed food, clothes, toys, and other miscellaneous items piled throughout the home. Mrs. Meeker recognized the home was unsuitable and unsafe for children. She further acknowledged that even though she received assistance from social services, her caseworker, and family support workers, she was unable to keep the home in a safe and healthy state.
 {¶ 5} After this visit, the home was cleaned; however, TCCSB returned in March of 2004 to find the trailer in the same or worse condition as before. Mrs. Meeker recognized the trailer had again become unsafe and unhealthy but was unable to explain why the conditions deteriorated so dramatically. The Meekers worked to improve their home conditions and the children remained home under the existing PSO.
 {¶ 6} In August of 2004, the Meekers acknowledged they could not manage all five children at home. In addition to the heightened activity of a five child household, Johnathon and Alexander were diagnosed with attention deficit and hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD). As a result, on August 26, 2004, the Meekers voluntarily released Johnathon and the twins into the temporary custody of TCCSB. The record indicates the Meekers surrendered temporary custody of Johnathon because they had greater difficulty managing his behavior than that of *Page 4 
Alexander. The twins were selected due to their age (10 months) as well as the agency's concerns for their safety and health. The three children were immediately placed into foster care and adjudicated dependent by the Trumbull County Juvenile Court on September 23, 2004.
 {¶ 7} With only two children in the home, Alexander and Steven, the Meekers worked to maintain a consistent, satisfactory home environment. During this time, TCCSB provided supervised recreation programs for Alexander to both reduce the stress on the Meekers and provide the boy with an opportunity to get out of the house. However, because the Meekers were unable to maintain consistency and regularity in their home maintenance and parenting strategies, TCCSB filed a complaint for an order finding Alexander and Steven dependent. On November 17, 2004, the court rendered a dispositional order adjudicating Alexander and Steven dependent pursuant to R.C. 2151.353(A). Following this adjudication, Alexander and Steven were permitted to remain in the Meeker's custody subject to a protective supervision order pursuant to R.C.2151.353(A)(1).
 {¶ 8} By spring of 2005, Lynn Alderman, the Meeker's case worker, testified the home conditions had improved greatly. Given the improvements, TCCSB began home visits for the twins beginning in May of 2005 and for Johnathon in June of 2005. TCCSB eventually moved the juvenile court to terminate the temporary custody of Johnathon and the twins and vest custody, subject to a protective supervision order, with the Meekers. However, shortly thereafter, home conditions again began to deteriorate. In July of 2005, TCCSB supervisor Marilyn Pape and the Meeker's *Page 5 
caseworker Lynn Alderman, visited the Meeker residence and documented, via photograph, its hazardous and unsanitary condition. Ms. Pape testified the home was in a deplorable state of clutter with garbage as well as animal and human feces strewn throughout.
 {¶ 9} On July 20, 2005, the matter came before the magistrate for a review hearing. In light of the Meeker's failure to maintain the home, the magistrate determined TCCSB should retain temporary custody of Johnathon and the twins. The magistrate further ordered temporary custody of the three boys extended by six months pursuant to R.C.2151.415(D) upon TCCSB's motion. Johnathon and the twins were subsequently ordered back into foster care. On August 3, 2005, the juvenile court adopted the magistrate's decision.
 {¶ 10} For several weeks, the Meekers had only Alexander and Steven at home and worked to return the residence to minimal standards of cleanliness. The Meekers were able to reach this goal and, after an October review hearing, the juvenile court amended the case plan which allowed Johnathon to return to live with the Meekers under the PSO to which Alexander and Steven were subject. The three eldest boys remained with the Meekers throughout the fall of 2005, however, additional problems ensued.
 {¶ 11} First, Alexander began experiencing greater behavioral problems and was placed in Youth Services, a children's psychiatric facility, for a week of hospitalization. In October of 2005, the Meekers nearly had their water service shut off for failing to pay their bill. TCCSB, by way of assistance, paid the $371 bill to keep the utility available. *Page 6 
Then, on the day after Thanksgiving of 2005, the Meekers were involved in a domestic dispute in which Mr. Meeker was arrested for domestic violence and spent the weekend in jail. A temporary protective order (TPO) was issued requiring Mr. Meeker to stay away from the family residence. Mrs. Meeker minimized this issue and did not disclose the severity of the episode to Lynn Alderman, the family's case worker. Ms. Alderman was later "shocked" when she read the police report which indicated Mr. Meeker choked appellant and threatened her as well as the children's life. After a two week separation, appellant dissolved the TPO and Mr. Meeker returned to the home.
 {¶ 12} By February of 2006, the family had moved from their trailer and purchased a home. Notwithstanding the move, home conditions were still an issue of great concern. In particular, at the beginning of the month, Ms. Alderman paid the family a visit and again found the home in an unsafe, unsanitary condition. She advised the Meekers to clean the home and indicated she would conduct a return visit on the following day. Upon her return, Alderman discovered that the Meekers had not only failed to address the uncleanliness she identified, but, in the meantime, they began a home improvement project. Alderman stated the home was so cluttered the family would have difficulty exiting in the event of an emergency. She observed garbage and other refuse throughout the home. She was notably dismayed by her observation of paint stripping chemicals situated within the children's reach. Alderman further reported the family had a cat in their home in violation of the court issued PSO. Mrs. Meeker did not dispute this and casually testified a cat and a dog were allowed in the home despite *Page 7 
the court's order. Mrs. Meeker further minimized the February episode stating she did not see anything wrong with the home; after all, "[t]he staircase was being redone."
 {¶ 13} Shortly after this episode, Mr. Meeker was placed on medical leave for several months. His medical condition prevented him from working over this period. As a result, the Meekers lost their home to foreclosure. After Mr. Meeker returned to work, the family found a home in Warren, Ohio that they rented for $450 per month. At the time of the hearing, the Meekers were residing at this home.
 {¶ 14} On March 1, 2006, TCCSB moved the juvenile court for six-month extensions of the protective supervision order of which Johnathon, Alexander, and Steven were subject.[1] After a March 2, 2006 hearing, the court granted the extensions. Notwithstanding their relocation, there was still no appreciable improvement in the manner in which the Meekers managed their home. Because no meaningful progress had been made addressing the major problems which led to agency involvement four years prior, TCCSB determined the interests of the children required it to file a motion for permanent custody of the twins on July 18, 2006. Later that month, on July 26, *Page 8 
2006, the agency filed a separate motion for permanent custody of Johnathon, Alexander, and Steven.[2]
 {¶ 15} A lengthy trial commenced in August of 2006 during which the court received evidence indicating the Meekers had been deceptive by withholding information regarding the condition of the home. Evidence was also submitted relating to a previously unreported violation of the court's PSO. Specifically, Julie Morris and Christopher Brister, friends of the Meekers, testified they lived in the family residence throughout the month of September of 2006 in direct violation of the PSO mandating no third parties in the home after dark.
 {¶ 16} Morris and Brister also testified they observed disturbing mistreatment of the children. Both individuals testified they observed Mr. Meeker, on one occasion, severely beat Johnathon with a belt for allegedly spilling laundry detergent. They also testified to witnessing Mrs. Meeker regularly striking Johnathon on the back of the head, sometimes with such force he would fall to the ground and cry. Mr. Brister further testified he had observed Mr. Meeker, in the course of an angry outburst, place Steven in a headlock tight enough to cause the boys face to turn purple. In addition, Mr. Brister *Page 9 
testified Mrs. Meeker had regularly failed to administer proper dosages of medication to the boys.
 {¶ 17} In light of this evidence, the court held an emergency shelter care hearing on October 20, 2006. The magistrate subsequently rendered emergency orders removing the three oldest boys into foster care which the juvenile court adopted on October 23, 2006. After the shelter care hearing and emergency custody being granted to the agency, a dispositional review hearing was held on December 1, 2006 on TCCSB's motion for temporary custody of Johnathon, Alexander, and Steven. After receiving evidence, the magistrate formally amended his prior dispositional order and awarded temporary custody to TCCSB. This order was adopted by the juvenile court on December 29, 2006.
 {¶ 18} As trial continued, evidence indicated the Meekers were making gradual progress without any children in the home. However, Alderman, as well as Pape, testified to their doubts regarding the Meekers ability to maintain long term progress and stability. Pape stated that throughout the four years the Meeker case was open, they demonstrated a continuous inability to care for the children, meet their needs, follow the prescribed case plans, and follow court orders.
 {¶ 19} At the conclusion of trial, Attorney Susan Rudnicki, the guardian ad litem for the three oldest boys, testified that the bonds between the Meekers and Johnathon, Alex, and Steven were significant; she recommended the Meekers retain custody of the three boys but conditioned her recommendation upon the court issuing a new PSO which would require heightened supervision of the family's lifestyle and behavior. *Page 10 
Attorney Pat Parry, guardian ad litem for the twins, however, determined the twins strongest bonds were with their foster family. He testified that because the twins had lived with the foster family for two-thirds of their life and throughout the past twenty two months, their interests would be best served if permanent custody was awarded to the agency.
 {¶ 20} After considering the evidence and the recommendations of the magistrate, the court awarded permanent custody of the twins to TCCSB; while the court did not terminate the Meeker's parental rights to the three oldest children it declined to adopt Attorney Rudnicki's recommendation on the issuance of a new PSO. Instead, the court ordered Johnathon, Alex, and Steven to remain in foster care until the Meekers are able to demonstrate a consistent ability to maintain a healthy and appropriate lifestyle. Mrs. Meeker now appeals.
 {¶ 21} Before addressing Mrs. Meeker's arguments on appeal, a crucial procedural matter deserves our attention. During this court's consideration of the underlying matter, concerns were raised as to whether the order denying TCCSB's motion for permanent custody is a final, appealable order (FAO). After careful consideration of the issue, we hold it is.
 {¶ 22} R.C. 2505.02(B)(2) provides:
 {¶ 23} "(B) An order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following:
 {¶ 24} "* * * *Page 11 
 {¶ 25} "(2) An order that affects a substantial right made in a special proceeding * * *."
 {¶ 26} A substantial right is "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." R.C.2505.02(A)(1). Further, a special proceeding is "an action or proceeding that is specifically created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity." R.C. 2505.02(A)(2).
 {¶ 27} With respect to the first element of the FAO analysis, the Supreme Court of the United States has held that the right to raise one's children is an "essential" and "basic civil right." SeeStanley v. Illinois (1972), 405 U.S. 645, 651. As a result, parents have a "fundamental liberty interest" in the care, custody, and management of their children. Santosky v. Kramer (1982), 455 U.S. 745, 753. It is therefore manifest that "parental custody of a child is an important legal right protected by law and, thus, comes within the purview of a `substantial right' for purposes of applying R.C. 2505.02." In reMurray (1990), 52 Ohio St.3d 155, 157.
 {¶ 28} Furthermore, the Supreme Court of Ohio has held that "[a]ctions in juvenile court that are brought pursuant to statute to temporarily or permanently terminate parental rights are special proceedings * * *."In re Adams, 115 Ohio St. 3d 86, 92, 2007-Ohio-4840, citing In reMurray, supra, at 161.
 {¶ 29} After the children were placed in emergency shelter care, the matter came before the court for a dispositional hearing. On December 1, 2006, the magistrate rendered his decision placing Johnathon, Alexander, and Steven in the temporary *Page 12 
custody of TCCSB. On December 29, 2006, the juvenile court adopted the magistrate's decision. In denying the motion for permanent custody, the juvenile court's ruling placed the three boys into the temporary custody of the agency by operation of the preexisting temporary custody dispositional order. See R.C. 2151.414(A)(1) (which provides: "The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated at the [permanent custody] hearing and shall not be affected by a denial of the motion for permanent custody.")[3] The order at issue was made in a special proceeding and affected the Meeker's substantial right to the care and custody of the three boys. Therefore, the order is both final and appealable.
 {¶ 30} We shall now address the merits of Mrs. Meeker's arguments on appeal.
 {¶ 31} Mrs. Meeker's first assignment of error reads:
 {¶ 32} "Whether the trial court upon denying the Children Service Board's motion for permanent custody erred in not immediately returning the three oldest minor children to appellant."
 {¶ 33} Under this assignment of error, Mrs. Meeker asserts the trial court erred when it determined the three eldest children should remain in foster care despite its *Page 13 
decision overruling TCCSB's motion for permanent custody. Mrs. Meeker maintains the trial court should have implemented a new PSO and permitted the children to return to the family home.
 {¶ 34} R.C. Chapter 2151 controls the authority and procedures of Ohio's juvenile courts. Because the paramount concern is promoting the interests of children, its provisions are construed liberally. In rePryor (1993), 86 Ohio App.3d 327, 337. A reviewing court will not reverse the judgment of a juvenile court save an abuse of discretion.In re William H. (1995), 105 Ohio App.3d 761, 767. An abuse of discretion is more than an error of law or judgment; it implies the court's attitude in rendering its judgment was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 35} Mrs. Meeker takes issue with each specific finding of the court supporting its decision not to return the children to the home immediately. First, Mrs. Meeker argues the court erred in its determination that household budgeting and expenditure of scarce family resources remains a problem. Mrs. Meeker points out that the family resides in a three-bedroom home in Warren, Ohio, each child has a bed and bedding, the family is current on all bills, appellant's husband is (and has been) gainfully employed, and the household expenses have decreased since the family moved into the current residence. Although Mrs. Meeker's assertions are supported by evidence in the record, the record also contains countervailing evidence supporting the court's decision. *Page 14 
 {¶ 36} With respect to this issue, the court determined "[t]hird parties were forbidden at the home during the night season by the PSO. A couple (family friends) lived there for the greater part of September 2006. These third parties not only used scarce family resources, but added to the clutter, and were themselves child welfare clients who had their children removed. The boys cannot be sent into this home. The parents are not able to self-report issues and problems. They are not able to follow a PSO."
 {¶ 37} The evidence revealed that Julie Morris and Christopher Brister lived, as accepted guests, in the family's home throughout the month of September in 2006. The PSO expressly forbade "third parties at [the] home after dark while street lights [are] on." During that time, Morris was pregnant and unemployed while Brister, who worked as an excavator, was in his "slow season" and worked maybe "ten days out of the month." Although Mrs. Meeker did not work and Mr. Meeker was earning only $300-$500 per week, there was no evidence that Morris and Brister contributed to the household expenses. Further, Morris testified Mrs. Meeker expressly advised her to deny she and Brister were living at the home if CSB ever inquired. Notwithstanding Mrs. Meeker's challenges, therefore, the trial court's finding was supported by the evidence in the record.
 {¶ 38} Next, Mrs. Meeker takes issue with the trial court's ruling regarding her inability to abide by the PSO with respect to the animal prohibition. Specifically, the trial court determined: *Page 15 
 {¶ 39} "No animals are allowed under the PSO at the home or outside of it, as the children carry in the feces, and create a health concern. The family continues to have a cat MOUSEY and buy it cat food. The boys were interviewed separately in camera with their GAL present. They all confirmed in great detail the family care of MOUSEY, including MOUSEY being bought cat food. The parents were not forthcoming in admitting what their children could set forth in great detail, and have lost credibility that they will follow any PSO. The Mother testified that there was a hole in the basement walls big enough for the cat to come inside. When asked why the hole is not closed, she indicated that they had. Yet the cat is continued to be found inside the home."
 {¶ 40} Mrs. Meeker asserts there was no evidence the children carried feces in the home. Further, Mrs. Meeker contends that the evidence was inconsistent regarding the cat living in the home and, in any event, the three eldest children's guardian ad litem testified to her belief that the cat was not an issue. Again, while Mrs. Meeker's points are accurate, they do not suggest the trial court's findings were arbitrary or unreasonable.
 {¶ 41} First, the initial comment regarding the children carrying feces into the home was not discussed during trial. However, the PSO prohibiting pets specifically stated that pets must not be allowed in or near the home because of the possibility that the children, when playing outside, could track feces into an already unsanitary environment. A continual theme throughout trial was the unsanitary and unsafe condition in which the family home was kept. Witnesses testified to finding animal and *Page 16 
human waste within the home during the time the family's case was open at TCCSB. As a result, the court's statement must be read as a concern for the foreseeable possibility that if animals are kept, even near the home, similar unsafe conditions could persist.
 {¶ 42} Further, the PSO explicitly stated "the home must be pet free." Despite this mandate, appellant testified she allowed animals in the house. Further, although Mrs. Meeker denied awareness of a cat named "Mousey," each of the three older children, interviewed individually, represented to the magistrate that they had a cat named Mousey who they fed with a mixture of cat and dog food. Furthermore, even if the cat was not in the home all the time, various witnesses, including appellant, confirmed that the cat would enter the home regularly. Given Mrs. Meeker's testimony and the older children's independent statements to the court, we believe the record supports the court's determination.
 {¶ 43} Next, Mrs. Meeker contends the trial court's determination relating to her parenting methods was error. The trial court held:
 {¶ 44} "When the older three children lived at home, their discipline was inconsistent and improper. The oldest do not receive their medicine properly and as prescribed. Some were reported sluggish in school. They were assigned inappropriate chores for their ages and punished inappropriately when they do not perform the adult tasks. They then became disruptive, and they suffered at school or at home. The twins, who are currently only three, cannot be sent into this home. The parents are not ready for the oldest three either." *Page 17 
 {¶ 45} Although both parents denied using aggressive physical discipline, the trial court received contrary evidence. Julie Morris testified she had observed Mrs. Meeker strike Johnathon on the back of his head on various occasions and sometimes so hard he falls to the ground and cries. Morris further stated she witnessed Johnathon sustain a prodigious beating at the hands of Mr. Meeker because he spilt laundry detergent while loading the washing machine; Chris Brister corroborated this observation and also, on a separate occasion, observed Mr. Meeker, while in the throes of anger, place Steven in a headlock until his face turned purple. Moreover, during the month Morris and Brister lived with the Meekers, each testified appellant failed to properly administer Johnathon's and Alex's medications. By way of corroboration, Lynn Alderman spoke with individuals at Johnathon's and Alex's schools. According to Alderman, the schools had concerns about whether Johnathon and Alex were being properly medicated due to their sluggishness in the classroom.
 {¶ 46} Next, Robin Moon, the supervisor for TCCSB's Family Support Workers, testified that, in her opinion, certain chores delegated to the three older boys were age inappropriate. For instance, Steven's chore chart included: making his bed; helping with garbage on Sunday; sweeping the bathroom floor on Sunday and Thursday; helping with the dishes on Monday and Thursday; feeding the fish on Tuesday and Wednesday; bringing down dirty laundry on Tuesday; empty bathroom trash on Friday; and, on Saturday, clean his bedroom. Ms. Moon stated she thought that the foregoing was "a little too much for the child," who, at the time was not yet 6 years old. *Page 18 
 {¶ 47} Alex's chore chart stated that, every day, he was to make his bed; help gather garbage; clean his room; feed the fish; help with the dishes; sweep the bathroom floor; and bring down dirty clothes. Ms. Moon opined that, while Alex is a bit older, 7 years old at the time, some of these things may be difficult, e.g., if there are steps, bringing down a laundry basket. Finally, Johnathon's chore chart was similar to Alex's except he was also required to load the dishwasher, take laundry down to the washer, and do laundry. Ms. Moon asserted that doing laundry was not appropriate for Johnathon, who was only 9 years old at the time.
 {¶ 48} Although some of the evidence was disputed at trial, the court's findings are based upon evidence in the record and neither arbitrary or unreasonable.
 {¶ 49} Mrs. Meeker next argues the court's findings relating to the "cleanliness and clutter" of and within the home were made in error. With respect to this issue, the court determined:
 {¶ 50} "This issue was the one that attracted both Mahoning County and Trumbull County CSB attention to open their files. At best, it has been minimal and only after a CSB caseworker comes in and tells them to clean it up. Home conditions continue to be marginal at best, even when the CSB caseworker prompts them to clean up. The household continues to be inconsistent. People sneak into the home and stay, and add to the problem. The three boys cannot be sent back."
 {¶ 51} At trial, the evidence revealed the Meekers have a chronic problem with maintaining a clean, safe, and sanitary home ranging from garbage, food, and animal feces strewn about the home to toys, laundry, and other miscellaneous clutter blocking *Page 19 
necessary throughways. Although, at the time of trial, the Meekers had shown some improvements in keeping their home in acceptable order, the record demonstrated they have experienced similar progress in the past, but each time the home would return to a prohibitive ebb of disorder and uncleanliness. This trend was particularly observable when the children were in the Meekers' custody.
 {¶ 52} Their caseworker, Lynn Alderman, testified to the Meeker's historic inability to maintain a minimal level of cleanliness in the home. She also testified that upon discovering the home in poor condition, she had, on occasion, instructed them to clean it and tell them when she would return. She stated, upon such urging, they would generally clean the home; however, other times they would not. In fact, Alderman detailed a recent occasion in February of 2006 where she found the home in a "deplorable" condition. She advised the family to clean up the home and she would return the next day. Instead of cleaning the home, the Meeker's commenced a home repair project leaving the residence in greater disarray than before. Further, Chris Brister, who had lived with the Meekers through the month of September of 2006, testified the house was acceptably clean "sometimes;" however, it was often below the level of acceptability.
 {¶ 53} While the record demonstrates the Meeker home has improved with respect to issues of "clutter and cleanliness," the court's findings are nevertheless supported by the record. The Meekers have a history of, at best, erratic housekeeping and the record suggests that each upturn in their attention to such details will be followed by a concomitant downturn. Because the Meeker's have been unable to *Page 20 
establish a long term lifestyle change in this regard, the court's findings on these issues is supported by the record.
 {¶ 54} Next, Mrs. Meeker argues the court's finding that the family failed to "sign releases and cooperate" is wrong. The court determined:
 {¶ 55} "The father ignores request to sign releases. He says he does not know what is on the PSO. When it was indicated that a copy was mailed to him, he said he did not recall as his wife handles everything. * * * Child support has been an open issue since 2004, and basic income verification has not been forthcoming to the Court or to the Family Support Worker (formerly called a Homemaker). The family is unwilling to cooperate. The court can no longer offer a PSO to them and the three boys cannot be sent back."
 {¶ 56} First, Mr. Meeker was charged with domestic violence when, in an alcohol induced rage, he choked Mrs. Meeker and threatened to kill her as well as the children. After the charge was reduced, he, as a part of his plea, entered alcohol rehab through Community Solutions. At trial, Mr. Meeker testified he refused to sign a records release to TCCSB regarding his alcohol rehabilitation at Community Solutions. He stated he had signed one release to the court and concluded he "didn't see a point in signing the second one." Irrespective of this conclusion, Mr. Meeker was required by the PSO to sign releases to surrender his treatment records to TCCSB. Even though he received copies of each updated PSO, he testified he was unaware of this requirement because Mrs. Meeker handled these matters. Mr. Meeker is able to read and was obligated to *Page 21 
attend to the requirements of the PSO regardless of Mrs. Meeker's management of the mail flow.
 {¶ 57} Furthermore, with respect to cooperation, Lynn Alderman, TCCSB's assigned caseworker, testified the Meekers denied her access to their home on at least one occasion. Robin Moon, TCCSB's Family Service Worker supervisor, testified that Mr. Meeker had threatened to shoot one of the agency's homemaker's "with a gun." Other instances of failures to cooperate can also be seen in the Meeker's conscious disobedience of the mandates set forth in the court's PSO.
 {¶ 58} Finally, although child support was not a matter pursued with any detail at trial, the Meekers gave only vague testimony regarding their household income. Mrs. Meeker indicated Mr. Meeker would bring home anywhere from $300 to $500 per week. However, when Mr. Meeker was asked to obtain his income tax returns, he deflected the request by stating he did not know if he retained such records. After instructing Mr. Meeker to solicit his employer to obtain the records, he asserted the employer does not keep copies of the returns because "[t]hey have an outside company do payroll." After more evasiveness, however, Mr. Meeker finally agreed to at least ask his employer for the records so the figures could be established. No evidence of the records was ever presented at the trial.
 {¶ 59} Given the foregoing evidence, it is clear the court did not err in drawing its conclusions regarding the issues surrounding the Meekers desire to cooperate with CSB as well as the court. . *Page 22 
 {¶ 60} Next, Mrs. Meeker argues the court erred when it found fault in the stability of their housing situation. To wit, the court found:
 {¶ 61} "Despite adequate money going into the household, the family lost their home to foreclosure. They moved into a rental. GAL Rudnicki described their current home as very small even for two adults and the three oldest children, let alone adding the twins as well. The agency has had to give them financial assistance for past due utilities. Where does the money go? Because of the failure to cooperate with the Family Support Worker (formerly called a Homemaker), this question remains unanswered. The court can no longer offer a PSO to them, and the three boys cannot be sent back."
 {¶ 62} First, Mrs. Meeker asserts the court's statement that the Meekers have enough income to sustain housing inconsistent with the court's finding that budgeting family resources has been a problem. There is no inconsistency when viewed in the context of each finding. The budgetary issues were identified as a concern because the Meekers household income is not substantial, yet they permitted two adults to live in their home that did not ostensibly contribute to the household expenses. Alternatively, the court's comment regarding adequate income in the above quoted paragraph relates to the Meekers ability to maintain consistent housing without third parties draining valuable resources.
 {¶ 63} Income aside, the court's concerns are valid. The Meekers have one breadwinner, Mr. Meeker. His annual income, while generally enough to keep bills *Page 23 
current, cannot be considered substantial.[4] This, in light of the fact that the Meekers have resided in three different homes since 2005, does not bode well for long term stability. Overall, the court's observations on this issue are based upon record facts and germane to the stability of the children. The court's findings are supported by the evidence in the record.
 {¶ 64} Finally, Mrs. Meeker argues the trial court's findings relating to the domestic violence disputes between the parties are inaccurate and erroneous. The trial court observed:
 {¶ 65} "There was a domestic violence call a year ago that caused police to be called and DV charges filed. Those issues have not been resolved through assessment and counseling. The Meekers just brushed over the problems and never addressed them. The boys cannot be returned to this home."
 {¶ 66} It is uncontroverted that, in November of 2005, Mr. Meeker was arrested for domestic violence after choking and threatening Mrs. Meeker as well as the children. We recognize there have been no other reported incidents of domestic violence. However, we also recognize there was testimony indicating both parents have administered severe physical discipline to Johnathon. Simply because no police reports have been filed since the formal domestic violence charge was processed does not mean the underlying issues causing the problem have been adequately managed.
 {¶ 67} In relation to this issue, the record reveals Mr. Meeker was assessed through Community Solutions for alcohol counseling; however, he specifically refused, *Page 24 
to sign a release of these records to TCCSB. Moreover, it was established that Mrs. Meeker was required, via the family's case plan, to obtain a mental health assessment. She failed to comply with the case plan on this issue. Although this assessment was notnecessarily tied to any issues of domestic violence, it is not unreasonable to conclude compliance on this issue might serve Mrs. Meeker well in the event tensions between her and other family members arise in the future. The court's findings on this point are therefore supported by the record and neither arbitrary or unreasonable.
 {¶ 68} Looking at the record in its totality, the court's findings justifying its decision not to immediately place Johnathon, Alex, and Steven back in the family home are supported by evidence within the record. The Meekers have a history of keeping an unsanitary and unsafe home as well as a pattern of utilizing unacceptable parenting methods. Furthermore, the record indicated the Meekers, at the time of trial, were unable, for whatever reason, to regularly comply with court orders which were implemented to help remedy the recurring lifestyle problems which placed them under scrutiny in the first place. As a result, rather than returning the children and implementing another PSO, with which the Meekers may or may not comply, the court determined the Meekers must first establish they have the ability to maintain the consistent and healthy lifestyle befitting parents of three young boys. The order is clear, when the Meekers demonstrate the ability and a willingness to make meaningful, lasting changes in their management of their householdand show a similar willingness and capacity to follow the directions of the court, the boys will be returned. Until they are able to actively demonstrate they are capable of such regularity, the children shall *Page 25 
remain in foster care. Given the case history, the court did not abuse its discretion in issuing this order.
 {¶ 69} Mrs. Meeker's first assignment of error is without merit.
 {¶ 70} Mrs. Meeker's second assignment of error contends:
 {¶ 71} "Whether the trial court erred in granting the Children Service Board's motion for permanent custody of appellant's youngest minor children."
 {¶ 72} R.C. 2151.414(B)(1) sets forth the applicable standard for determining the motion for permanent custody in the instant case. This section provides:
 {¶ 73} "* * * the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 74} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 75} "(b) The child is abandoned.
 {¶ 76} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 77} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months *Page 26 
of a consecutive twenty-two month period ending on or after March 18, 1999." R.C. 2151.414(B)(1)(a)-(d).
 {¶ 78} Here, the trial court determined, by clear and convincing evidence, that Nicolas and Robert "have been in care for over 12 [of] the 22 month period immediately preceding the TCCSB Motion for Permanent Custody, and the ORC 2151.414E [sic] factors were [therefore] not considered." This finding was made pursuant to R.C. 2151.414(B)(1)(d) and is supported by the record.
 {¶ 79} As the juvenile court properly complied with its statutory obligation under R.C. 2151.414(B), we shall address the court's analysis as it relates to the children's best interest. To determine the child's best interest, the trial court must consider all relevant factors, including but not limited to:
 {¶ 80} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 81} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 82} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; *Page 27 
 {¶ 83} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 84} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D)(1)-(5).[5] *Page 28 
 {¶ 85} In awarding permanent custody to CSB, the juvenile court must conclude, by clear and convincing evidence, that the assignment is in the child's best interest. To this end, the juvenile court first considered the interaction and interrelationship of the twins with their mother, father, siblings, and foster parents. See R.C. 2151.414(D)(1). The court then found, by clear and convincing evidence:
 {¶ 86} "The strongest bonds of the twins are to each other and to their foster family. The foster family has had them from August 2004 to the present, with but two months in early summer of 2005 for an extended visit. The children were removed and extended visits cancelled because of failure to follow the PSO that created a danger to them. The foster family is very loving, caring, and consistent. The foster family can give them permanency and stability. The foster family has been with the twins for every major milestone, including assisting the children to adjust to their extended visits with the biological parents. The twins have been integrated beyond the immediate nuclear foster family into the homes of the foster family's siblings and parents, as well as their greater community.
 {¶ 87} "The twins know their older brothers and continue to visit them. They play together. They know their brothers as their brothers. The foster family is committed to continuing that bond, and permanent custody is not likely to end that relationship so long as the older boys are not disruptive and there are no major events in the foster family's life. *Page 29 
 {¶ 88} "The foster family encourages the twins to see their parents and call them mother and father. The foster family has done a remarkable job in not alienating the twins from their biological parents. They listen to their parents. They show affection to their parents. They do not resist visitation time. As a result, despite not living with their biological parents for 20 of the past 22 months, the twins have bonded to their parents.
 {¶ 89} "But the major caregiver to the twins and major bond of the twins is to their foster family. The twin's strongest affection is to their foster parents and they are happiest with them.
 {¶ 90} "The twins are too young to express a preference. But from their actions and interactions, the Court concludes that their real parents are their foster parents." (Emphasis sic.)
 {¶ 91} The foregoing determination was supported by the recommendation of the twins' guardian ad litem. In addition to this recommendation, the trial court's analysis of the bonds established between the twins and other interested parties was supported by the testimony of the Meeker's caseworker, Lynn Alderman. As a result, the court's analysis is supported by the record.
 {¶ 92} The court next found, by clear and convincing evidence, that the wishes of the twins, as expressed through their guardian ad litem, is to award permanent custody to TCCSB. See R.C. 2151.414(D)(2). The court reiterated that the twins were placed in foster care in August of 2004 and therefore "from the date of the conclusion of [the] proceedings, the twins have been in the temporary custody of TCCSB for 22 months." See R.C. 2151.414(D)(3). The court also found that the twins have a need *Page 30 
"for a legally secure, permanent placement and that cannot be achieved without the grant of permanent custody." R.C. 2151.414(D)(4). Finally, the court determined that none of the factors set forth in divisions R.C. 2151.414(E)(7) to (11) applied. See R.C. 2151.414(D)(5).
 {¶ 93} After finding the above factors by clear and convincing evidence, the court determined that it was in the twin's best interests to grant TCCSB permanent custody. A thorough review of the record demonstrates the juvenile court satisfied its statutory duties by weighing all relevant factors under R.C. 2151.414. See In reSchaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 65. As a result, its decision to grant permanent custody is hereby affirmed.
 {¶ 94} Mrs. Meeker's second assignment of error is overruled.
 {¶ 95} For the reasons set forth in the foregoing opinion, Mrs. Meeker's assigned errors are overruled and the judgment of the Trumbull County Court of Common Pleas, Division of Domestic Relations, Juvenile Department is affirmed.
DIANE V. GRENDELL, P.J., concurs, COLLEEN MARY OTOOLE, J., dissents.
[1] Pursuant to R.C. 2151.353(G)(1), a party may seek a six-month extension of a PSO no later than one year after the earlier date of the complaint in the case or the child was first placed in shelter care. Moreover, prior to the termination of the extension, a party may seek an additional six-month extension of the PSO. R.C. 2151.353(G)(2). If the additional extension is granted, the court is required to terminate the PSO at the end of the extension. R.C. 2151.353(G)(3). Alexander and Steven were never placed in shelter care. As a result, a year from the date of TCCSB's complaint for dependency, October 25, 2004, was the date from which the timing of the motion to extend the PSO would be measured. A first extension was granted on October 4, 2005, well within the statutory time constraints. Alternatively, Johnathon was adjudicated dependent on September 23, 2004 due to the Meeker's voluntarily surrender of custody to TCCSB (no formal complaint for dependency was submitted on the voluntary relinquishment of custody). The juvenile court granted a six-month extension of temporary custody to the agency on July 20, 2005. On October 4, 2005, Johnathon was returned to the Meeker's custody subject to the existing PSO. These dates therefore indicate the March 1, 2006 motion for extension was the second extension of the PSO as it relates to Alexander and Steven and the first extension of the PSO sought as it relates to Johnathon. Hence, each of the three boys were previously adjudicated dependents and subject to extant dispositional orders at the time TCCSB filed for permanent custody in July of 2006.
[2] Although the three oldest boys were not in the temporary custody of TCCSB at the time the agency filed its motion for permanent custody, nothing in the statute requires agency custody as a prerequisite for filing a motion to terminate parental rights. In fact, a juvenile court may issue a dispositional order awarding permanent custody to children services immediately after an adjudication of dependency. See R.C.2151.353(A)(4) (expressly permitting a juvenile court, after an adjudication that a child is abused, neglected or dependent, to render a dispositional order committing a "child to the permanent custody of a public children services agency * * * if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interests of the child.")
[3] Moreover, the Supreme Court of Ohio has frequently stated a judgment or order affects a substantial right when appropriate relief would be foreclosed in the future if it is not held immediately appealable. In re Adams, supra, see, also, Wenzel v. Enright,68 Ohio St.3d 63, 67, 1993-Ohio-53 (Sweeny, dissent); Bell v. Mt. Sinai Med.Ctr. (1993), 67 Ohio St.3d 60, 63. Here, the court's judgment is tantamount to an award of temporary custody to TCCSB. If a parent is not allowed the opportunity to immediately appeal a juvenile court's temporary custody order, the parent is not assured an opportunity to have the decision reviewed. This analysis underscores the gravity of the rights being affected by the juvenile court's decision.
[4] TCCSB did pay a $391 past due water bill while the Meeker case was open to prevent this utility from being shut off.
[5] 5. R.C. 2151.414(E)(7)-(11) state:
"(7) The parent has been convicted of or pleaded guilty to one of the following:
"(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
"(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
"(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
"(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense; "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
"(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
"(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
"(10) The parent has abandoned the child.
"(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or 2151.415 of the Revised Code with respect to a sibling of the child. *Page 1